Edward F. McLaughlin, J.
This proceeding was originally initiated under a writ of habeas corpus returnable at Special Term on June 3, 1975 in which the petitioning father sought a change 'of custody from the respondent mother of an infant daughter, Jane B. The parties were married in 1965, separated in 1968 and a divorce was granted in 1971 to the father on the basis of a filed separation agreement executed June 17, 1968 which was incorporated but not merged in the judgment of divorce. The only child of this marriage was Jane B., who was born October 1, 1965. Custody of this child was granted to the mother in the judgment of divorce based on the provisions of the separation agreement. The infant child has been in continuous custody of the mother to the present date.
The habeas corpus proceedings came before the Special Term and at the suggestion of the court, counsel for -the respective parties agreed in a written stipulation dated June 10, 1975 that the preferable procedure in this matter was for a determination whether the original judgment of divorce and the separation agreement should be modified as to custody of the infant child. Inasmuch as Honorable Richard D. Simons, who granted the original divorce, is now serving in the Appellate Division, an order was signed by the court, based on the stipulation of the parties, referring the matter for a plenary hearing as to the custody of the infant, Jane B. The hearing was conducted by this court on August 19, 20, 21, 1975 in Trial Term, held in and for the County of Onondaga.
During the hearing, both parties testified. In addition, the maternal grandmother of the infant .child, Jane B., and a school psychologist from the school district in which the infant child was a student, testified. In addition, seven separate exhibits were received into evidence without objection.
*517 In brief, the evidence disclosed that the mother has had sole custody of the infant child, Jane B., in accordance with the separation agreement and the judgment of divorce granted by the court. The father has visitation rights which he usually exercises on Sundays when he picks up the child at his former wife’s apartment and brings her to his home where he resides with his aunt, 85 years of age, and his present wife whom he married on August 1, 1975.
The father agreed that the child was well dressed when he went to get her at the mother’s apartment, but on occasions he would receive a call that the mother and child were going away for the weekend and he would not be able to see the child Sundays of such weekends. The father testified that on his visits to the apartment, Lucy Q., who resided there with his former wife and the infant child, was constantly rocking during his visit and did not converse with him. It was also indicated that Lucy Q. and his former wife slept together in one bedroom, which observation led him to suspect that an abnormal relationship existed. The infant child had a separate bedroom, and in between these two bedrooms was a third bedroom, utilized as a den or for storage.
The maternal grandmother of the infant child is employed as a senior laboratory technician at Upstate Medical Center and is the supervisor of her daughter, the mother of the infant child, and Lucy Q., who likewise are employed as technicians under her direction. Her daughter, the mother of the infant child, with the infant child, Jane B., lived with her until August, 1974 when they moved into an apartment. Lucy Q. lived with them for a short time before moving with the respondent mother and the infant child, Jane B., to the apartment. She had observed their behavior at work and also had visited the apartment and had had dinner there on occasions. She said that Lucy Q. and the respondent mother, her daughter, had slept in the same bedroom when they lived at her house. She observed Lucy Q. rocking in a rocking chair and also engaging in long telephone conversations. She was confronted with a written signed statement taken by petitioner’s attorney who called her as a witness, taken at her home on May 27, 1975 in which she stated that Lucy Q. and her daughter, the respondent mother, act like husband and wife, sleeping in the same bed and that they whispered to each other and talked over the telephone with each other when they were not together, that Lucy Q. rocks all the time, yells *518 at Jane B., and that Lucy Q. and her daughter, the respondent mother, leave the infant, Jane B., alone outside and ignore her at all times. She admitted that she gave this statement and signed it. She also told the plaintiffs counsel who called her to the stand that she didn’t read it, that she loves Jane B. even more than her daughter and she was upset when her daughter had moved out with Jane B. since she wanted them to remain. She testified that the statement was made under emotional strain and she had since learned the true facts and apologized to her daughter.
The school psychiatrist of the East Syracuse-Minoa School District, testified that he had conducted a series of tests after a conference with the parents which had been initiated by a referral from the fourth grade teacher who had Jane B. in her class.
The tests showed that the child had an I.Q. of 133 which was superior. Her scholastic achievements, however, did not indicate that she was working to her full intellectual capacity. A visual test was indicated. She was clean, well-dressed and cared for, well motivated and was average in her classwork.
He concluded that she was emotionally upset. He believed a change of living environment was indicated. This conclusion was made before he visited the apartment where the infant child resided with her mother and Lucy Q. He later visited the apartment, found it to be very clean and modern. He said that while he was there, Lucy Q. was present in a rocking chair and didn’t talk or come to see who he was upon his arrival. He learned that Lucy Q. and the infant child’s mother slept together, watched television and talked together to the exclusion of others, and from his observation, this indicated an abnormal relationship between these two ladies, and that the home of the petitioning father would be more conducive to normal development of the child. Under cross-examination, he admitted that the divorce of the parents itself could be one of the causes of an emotional disturbance of the child. He also stated that he did not know whether there was any emotional problem involving the child before the trip that she made to Europe to visit the paternal grandmother, and in cross-examination he could not specifically pinpoint the cause of the child’s emotional problems, but suspected the child was living in an abnormal atmosphere and the tests he performed showed an emotional disturbance.
The mother of the infant child testified that she had had *519 custody of the infant child since her birth and was awarded custody by judgment of divorce in 1971. She and the child and Lucy Q. lived for some time with her mother, after which they obtained an apartment where she has lived to the present time with Lucy Q. and the infant child. She said that she gave permission for the infant child to accompany her father to Europe to visit the paternal grandmother, but the father later learned that he could not go. She paid one half of the fare for the child on the trip to Europe. Upon receiving a telephone call from her daughter after two weeks, and at the daughter’s request, she went to Europe, stayed an additional week with the child and paternal grandmother and then came home with the child.
She states that she drops the child off at school in the morning. Lucy Q., who gets off work a little earlier than she, picks up the child at school and brings her home. She has a regular baby sitter for the child during the school vacations while she and Lucy Q. are at work and has never left the child alone. She also testified that her outside social life is restricted because of her working hours and the care of the child after working hours, but she does occasionally go bowling or to shows and out to dinner and occasionally dancing with men and that Lucy Q. does likewise when time permits. She was not questioned by either counsel as to any homosexual relationship with Lucy Q., and Lucy Q., although present throughout the hearing, was not called as a witness by counsel for either party to testify.
The respondent mother testified that she never denied visitation to the father except to offer a substitute day if she was going away with the child on a weekend.
She said that the infant child, Jane B., had passed all of her subjects in June, 1975 and had been certified for promotion to the next grade in school. She also testified that she, Lucy Q., and the infant child were going to move back into the home of her mother in October, 1975.
At the request of both parties, the court in the exercise of its discretion, interviewed the infant on August 26, 1975 on the record in chambers and such record, in accordance with our practice, is to be sealed. The child was clean, well-dressed, and normal in her appearance and response to the questions of the court. Suffice it to say that there was no derogatory information as to either parent or as to the home environment in which she lives with her mother and Lucy Q. or that *520 of her father. She was not questioned as to the alleged homosexuality issue as a matter of discretion.
At the close of the hearing on August 21, 1975, the court reserved decision and interviewed the child, Jane B., on August 26, 1975 in chambers and sealed the record.
While the decision was still pending, the court was advised that the respondent mother and Lucy Q. appeared at the home of the maternal grandmother and admitted that a homosexual relationship existed between them which was carried on at night in their bedroom in the apartment which was the residence of the child, Jane B.
The maternal grandmother would not permit Lucy Q. to move back into her home with the respondent mother and the infant child as they had planned to do by virtue of this situation.
Upon being advised of this situation, the court conferred with both counsel and advised them that a further hearing would be required. At this stage Milton Macht, Esq., was still representing the respondent mother. A hearing date was set for September 26, 1975. Prior to that date, attorney Macht suggested to the respondent mother that she cease living with Lucy Q. so as to retain custody of the child. On the hearing date, a substitution of counsel for respondent mother was made on the record wherein Milton Macht, Esq., was replaced by Bonnie Strunk, Esq. A request for adjournment was made by her and granted by the court. A new hearing date was set for October 6, 1975.
The hearing was held in Syracuse on October 6 and 7, 1975, at which time the respondent mother, Lucy Q., the maternal grandmother, the school psychiatrist and an additional qualified psychiatrist testified.
In brief, both the respondent mother and Lucy Q. admitted that they slept together and carried on a homosexual relationship at night in the jointly occupied bedroom in the apartment in which the child resided in a separate bedroom. The respondent mother testified that she never discussed homosexuality with Jane B., the infant child, nor showed any emotion or affection toward Lucy Q. in the presence of the child. She further testified that she intends to keep living with Lucy Q. since they work together and she sees no harm or exposure to the child in this clandestine deviate conduct. She stated that Lucy Q. lived with another woman and was a homosexual *521 before she met her, but that she first engaged in homosexuality after meeting Lucy Q.
Lucy Q. admitted being a homosexual, that her relationship with the respondent mother began in May, 1974, and also that she engaged in such relationship at night in their bedroom where they sleep together. She likewise stated that the infant child, Jane B., resides there in a separate bedroom. She further testified that she has had no physical relationship with the infant, Jane B., or any other child and that any homosexual relationships have been with adult females. She also testified that her older sister, who visits the apartment, is a homosexual.
Lucy Q. and the respondent mother have moved and are now living in a two-bedroom apartment in Liverpool, New York. Jane B. has a separate bedroom next to her mother’s bedroom.
The maternal grandmother testified that the respondent mother and the infant child lived with her after the respondent mother’s divorce in 1971 for one year, then moved out for one year, then back again until she and Lucy Q. got an apartment. Lucy Q. stayed at the maternal grandmother’s about two weeks before they moved to the apartment. She further stated that on September 5, 1975, Lucy Q. and the respondent mother admitted their homosexual relationship to her and she would not permit them to move back in together. On September 7, 1975, the maternal grandmother and another sister talked with the respondent mother for about four hours in the absence of Lucy Q. and the infant child to try to persuade her to give up this relationship but they were unsuccessful.
A qualified psychiatrist called by the attorney for the petitioning father testified he reviewed exhibits 5 and 6A (school psychologist’s tests) and in response to a hypothetical question concluded that the infant child was emotionally unsecure. He further testified that being close to the mother, the child could emulate her conduct and that the present living environment would be harmful to the child. It is the psychiatrist’s opinion that a homosexual sometimes switches affection to another partner. He concluded that the father’s living conditions presented a more normal living environment for the infant than that in which she is living at present.
Another qualified psychiatrist called by the attorney for the respondent mother testified that he also had reviewed exhibits *522 5 and 6A and in response to a hypothetical question, stated that the homosexual relationship per se as described would not be harmful to the child should she become aware of it nor would it cause the child to become a homosexual. He also testified that the' child would become aware of the relationship even with unconscious clues. In general, the witness concluded that the child’s present living environment was not harmful to the child.
At the conclusion of the hearing, the court requested an investigation of the living environment at the apartment of the respondent mother and the home of the child’s father, as it would relate to the child, Jane B., now age 10. In brief, the report received by the court on November 25, 1975, was favorable in respect to the physical aspects of the residences of each parent. Both parents reportedly have good incomes and there is no financial problem.
The respondent mother and the infant child have recently moved from the former apartment to a two-bedroom apartment in Liverpool because they could not keep a dog at the former apartment. Lucy Q. moved with them and is sharing expenses equally with the respondent mother. The infant child is still enrolled at Fremont Elementary School and will continue there until the end of the school year. The father is still paying $150 a month alimony to the mother and $150 a month support for the child. Both the petitioning father and the respondent mother had some negative things to say about each other.
The petitioning father says the respondent mother only wanted $300 a month and is not interested in the infant child who does not do well in school and has few friends, and that the child and the mother do not do things together. He also stated that he filed this proceeding for custody at the urging of the school psychologist.
The respondent mother said that the infant child likes to visit her father if he has something planned for her to do but that she does not want to stay overnight. She further claims that the infant child does not want to live with her maternal grandmother unless her mother lives there too and that the child does not want to live with her father. These are some of the salient points set forth in the report the investigation conducted at the request of the court. The decision as to custody rests with the court alone based on all the evidence in this case. The purpose of this report of investigation, based on *523 the factual findings, is to assist the court in arriving at a decision as to custody, which is solely the duty and responsibility of the court, based on all of the evidence in the case.
Each of the parents in this matter, which involves the custody of this infant child, must look to the best interest of the child. This is the controlling and paramount issue before the court in this proceeding to which the wishes of the parents must yield.
Parents are equal in legal rights to the custody of the children. Where custody is already in the mother by means of the separation agreement entered into between the parties, incorporated but not merged in the judgment of divorce, and the proof shows that the mother is a fit custodian and that the child is well cared for, loved and protected, custody should remain in the mother, absent a showing of such changed circumstances as would warrant the transfer of custody. (Wasserberger v Wasserberger, 42 AD2d 93, affd 34 NY2d 660.) It is noted that there was no issue of alleged homosexual relationship existing at the time of the divorce of these parties in 1971.
Changed circumstances which would warrant a change in custody consistently have been found by the courts to include a showing that the custodial parent is unfit to have custody. (Aberbach v Aberbach, 33 NY2d 592; Nierenberg v Nierenberg, 36 NY2d 850.)
The issue before this court is whether the custodial parent is unfit in view of the existing homosexual relationship being carried on in the home where this 10-year-old female child resides. This brings into focus the real issue with which the court must concern itself, namely — "Is the present living environment in the best interest of the child?” We are not primarily concerned here with the visitation rights or whether the child is working to her full capacity in school. Our paramount concern is whether the environment in which the child lives is a proper one and in the best interest of the child.
The respondent mother’s counsel has submitted a lengthy brief covering the constitutional rights of. the respondent as to freedom of speech and actions. In the cases cited by respondent, it is noted that there was no showing of emotional effect on a child either by (1) parents’ drinking problems (McKensie v McKensie, 306 SW2d 588); (2) dating habits (Feldman v Feldman, 45 AD2d 320; Matter of Rudolfo ”CC” v Susan "CC”, 37 AD2d 657); or (3) racial differences (People ex rel. Portnoy *524 v Strasser, 303 NY 539). In each case the court said, or at least implied, that were any emotional effect on the child shown, custody would be changed.
The United States Supreme Court cases cited by respondent may also be distinguished on similar grounds. In Meyer v Nebraska (262 US 390), May v Anderson (345 US 528), Skinner v Oklahoma (316 US 535), and Prince v Massachusetts (321 US 158), the court spoke of the basic rights of man including the right to raise children which the state cannot hinder. None of the cases were addressed to homosexuality or the "best interests” of children. The Skinner decision is a landmark case written by Justice Douglas in 1942 which concerns vasectomies of "habitual criminals” but has no application here. In Pierce v Society of Sisters (268 US 510) the court said (p 535) that the State cannot "standardize” children; however, there was no homosexual issue or emotional question involved.
In Griswold v Connecticut (381 US 479) Justice Douglas writing in 1965 about contraceptives as bearing on the private rights of citizens guaranteed by the Bill of Rights held that the use of contraceptives was a private right of husband and wife concerning their decision to have or not have children. As such, it is not material to the issue of a child’s welfare or the interests in the case at bar.
Later cases including Eisenstadt v Baird (405 US 438) and People v Rice (80 Misc 2d 511) hold that consensual sodomy cannot be made criminal. United States v Doe (12 Cr L 2531) and United States v Griffin (Crim No. 60509-72, etc.) protect consensual sodomy or, in essence, homosexuality. These cases do not, however, extend the protection to innocent bystanders or children who may be affected physically and emotionally by close contact with homosexual conduct of adults.
Olmstead v United States (277 US 438); also Kent v Dulles (357 US 116), give citizens right to their own life style. (Respondent here can have her own life style but she cannot impose it on her child who is a ward of the court.).
Respondent’s counsel cites cases for the principle that homosexuals cannot be placed in a "suspect” category. The issue here, however, is not homosexuality; it is solely the best interest and welfare of the child that the court must consider under the existing circumstances of the case. The cases cited go to "fundamental personal rights” and "right of privacy”. The court here is not abridging respondent’s fundamental *525 rights or privacy but concerns itself solely with the well-being of the child and the questions as to whether the present environment is a proper one for this child and in her best interest.
Harper v Virginia Bd. of Educ. (383 US 663), McLaughlin v Florida (379 US 184) and Korematsu v United States (323 US 214) discuss government interference with fundamental rights only where (1) there is a compelling governmental interest and (2) governmental intervention is "necessary”. These cases are not in point insofar as the problem posed in this instant case.
In Stanley v United States (405 US 645) the court would not presume that an unmarried father was an unfit parent. In the instant case, the court is not required to find that a homosexual mother, by virtue of that fact, is an unfit parent. From the testimony elicited in these hearings, it appears that respondent takes care of the physical needs of the child in a satisfactory manner, but it also appears that the home environment with her homosexual partner in residence is not a proper atmosphere in which to bring up this child or in the best interest of this child.
This is not a matter of constitutional rights of respondent or Lucy Q. to be homosexuals or a violation of their freedom of choice of actions. The fundamental question is whether, in the sound discretion of the court, this type of living environment is detrimental to the welfare of the child and in her best interest.
In Shelton v Tucker (364 US 479), Keyishian v Board of Regents (385 US 589), Pickering v Board of Educ. (391 US 563) and Perry v Sindermann (408 US 593) the court protected teachers’ activities outside of school such as (1) joining organizations without telling school authorities (Shelton); (2) Communist Party membership (Keyishian); (3) criticizing school board (Pickering); and (4) publicly criticizing school (Sindermann). Again these cases go to fundamental personal rights that do not involve affecting third persons. These cases held only that each teacher was qualified and carried on his activities outside school which did not affect his teaching or the children he taught.
In Acanfora v Bd. of Educ. of Montgomery County (359 F Supp 843) a homosexual teacher attended public gatherings and made known his views on T.V. and radio. The court held that it was not proper to dismiss the teacher where the *526 homosexuality had no effect on his teaching ability or on the students. However, when the teacher sought publicity for his cause after his discharge, the court found this to have a deleterious effect precluding reinstatement to teaching duties.
Gay Students Organization v Bonner (509 F2d 652) had to do with whether a university could limit off-campus activities of homosexual student. It could not. Here the students were making their own choice of fundamental beliefs. They were adults or close to being adults by law.
In Matter of J.S. & C. (129 NJ Super 486), which respondent cites for the principle that a homosexual parent has a fundamental right to the care of his child, the court found that unrestricted visitation by a homosexual parent would not be in the best interests of the child emotionally, and restricted visitation by the homosexual parent to daytime hours and further said that during times when the homosexual parent was with the child, the "defendant shall:
"1) not cohabit or sleep with any individual other than a lawful spouse,
"2) not take the children or allow them to be taken to 'The Firehouse’ [a meeting place for homosexuals], and
"3) not involve the children in any homosexual activities or publicity,
"4) not be in the presence of his lover” (p 498).
For the most part, the cases cited by respondent are not relevant or material to the issue of custody in the case before this court. None of them relate to the welfare of a child living in a homosexual environment, except Matter of J.S. & C. (supra) cited by respondent which is contra to the position which she wishes the court to take in the instant case.
It is indisputable that the custody and welfare of the child is within legislative regulation. (People v Ewer, 141 NY 129.) The best interest of the child is the predominant criterion, to which, in the event of conflict, all others must be made to defer. (Lockwood v Jagiello, 24 AD2d 544; Burns v Burns, 264 App Div 894.)
The court, with respect to custody disputes, acts as parens patriae. It looks at the total picture and attempts to consider and weigh all factors in determining what is for the best interest of the child. (People ex rel. Wasserberger v Wasserberger, supra.)
Here by statute there is governmental interest in the wel *527 fare of children which supersedes the rights of parents, wishes of the children themselves and makes necessary intervention where the child’s emotional health and well-being are jeopardized. (Domestic Relations Law, § 240.)
The issue before this court is not freedom of speech, freedom of action or other constitutional rights of the respondent or Lucy Q. with whom she admittedly cohabits in a lesbian relationship in the apartment where the infant child, Jane B., lives. The mode of life chosen by respondent and Lucy Q. per se is not the concern of the court. However, the presence of the 10-year-old child, Jane B., living in this environment is the concern of this court, since the welfare and best interests of the child, whose future is at stake in this custody dispute between the parents, is the sole and ultimate responsibility of the court. The provisions of a separation agreement as to custody of the children cannot bind the court. (People ex rel. Wasserberger v Wasserberger (42 AD2d 93, supra.)
1. Here the child’s interest is of paramount concern.
2. Respondent’s cases go to fundamental rights of adult citizens or in those cases where children are involved, it is clearly established that the children’s welfare, emotional and physical, has not been jeopardized.
3. Lucy Q. and respondent can live as they will as two consenting adults. However, the child’s interest is the responsibility of this court delegated by statute in the nature of guardianship which takes precedence over the mother’s right of custody where the child’s emotional health, welfare and best interests are concerned.
The court, having reviewed the moving papers and those in opposition, and having heard counsel for the petitioning father and responding mother, and having heard the witnesses and evaluated their testimony and reviewed the exhibits in evidence, and after due deliberation based on the facts and law, does hereby find that the homosexual relationship admittedly carried on by the respondent mother, and Lucy Q. in the apartment where the infant child, Jane B., resides, creates an improper environment for this child. The court further finds that living with her mother while Lucy Q. lives there in a lesbian relationship with the mother is not for the best interests and welfare of the child. The court also finds as an issue of fact, on the evidence, that the child is emotionally disturbed by virtue of this environment and that the total circumstances warrant a change in custody.
*528 In determining the question of custody, the court must be guided by provisions of section 70 of the Domestic Relations Law that there is no prima facie right to custody of a child in either parent, but that the court shall determine solely what is in the best interests of the child and what will best promote its welfare and happiness. This is the true test to be applied rather than any claimed constitutional rights of the mother to live her own life style. This is her prerogative, but it must yield to the best interest and welfare of the infant child.
therefore, it is ordered that custody of the infant child, Jane B., be granted to the father, and that custody be transferred from the mother to the father within 30 days from the entry and service of the order based on this memorandum decision.
it is further ordered that when custody of the child is transferred to her father that the monthly support order of $150 for the child, Jane B., contained in the separation agreement incorporated into the decree of divorce is terminated as of the time of transfer of custody and the decree so modified. The provision for the payment of $150 under the provisions of the separation agreement and decree, as alimony or support of the respondent mother remains in effect.
it is further ordered that when custody of the child is transferred to the father, the mother will have reasonable visitation rights subject to the following conditions:
1. That the child, Jane B., will not remain overnight at respondent’s residence nor is she to be taken there to visit while Lucy Q. or other homosexuals are present;
2. That the child will not be taken to any other place where known homosexuals are present;
3. That the mother will not involve this child in any homosexual activities or publicity.
it is further ordered that the child, Jane B., will remain in the same school through the current school year ending in June, 1976 and that transportation to and from school will be arranged for her.