727 P.2d 830

**In the Matter of the APPEAL IN PIMA COUNTY JUVENILE ACTION B-10489.**

**No. 2 CA-CIV 5548.**

Court of Appeals of Arizona, Division 2, Department A.

Aug. 11, 1986.

Review Denied Oct. 21, 1986.

Ann M. Haralambie, Tucson, for appellant.

George Haskel Curtis, Tucson, attorney appointed by Juvenile Court.

Frederick S. Klein, Tucson and Roberta Achtenberg, San Francisco, Cal., for amici curiae Arizona Civil Liberties Foundation, Lambda Legal Defense and Educ. Fund, Lesbian Rights Project.

## CORRECTED OPINION

HATHAWAY, Chief Judge.

This appeal follows the juvenile court's order certifying appellant as nonacceptable to adopt children.

On May 16, 1984, the Pima County Attorney filed a petition for preadoption certification on behalf of appellant in accordance with A.R.S. §§ 8–105 and 8–127. The petition was appended to an adoptive home study ("written report"), appellant's application to adopt a child and appellant's autobiography, which together contained the information required by A.R.S. § 8–105(C). The written report was prepared by a Department of Economic Security ("division") caseworker and included the division's recommendation that the court certify appellant as being acceptable to adopt children. See A.R.S. § 8–105(F). On July 13, 1984, the juvenile court entered an order which, in its entirety, stated:

> The Court having reviewed the adoptive home study submitted with the Petition for Certification, IT IS ORDERED that the applicant, [the appellant], sole petitioner, is certified as being nonacceptable.

Appellant subsequently retained private counsel and petitioned the court to review its certification order pursuant to A.R.S. § 8–105(K). See also § 8–127. On the date scheduled for appellant's review hearing, the court entered an order vacating the matter and appointing private counsel "to

represent the Court and the interests of any child who might be placed for adoption with petitioner, [the appellant]." Appellant's motion to set aside the order which appointed court counsel and created a class of unknown prospective adoptive children was denied and a review hearing was scheduled for July 1, 1985.

Appellant testified at the review hearing. In addition, appellant called three witnesses, the division caseworker who prepared the investigation report and two persons who testified regarding their personal knowledge of appellant. Admitted into evidence were the written report, appellant's application to adopt a child and various documents regarding appellant's financial and employment status. The juvenile court's appointed attorney presented no evidence and did not call any witnesses, but participated in the hearing by cross-examining appellant's witnesses. The matter was taken under advisement at the close of the hearing on July 1.

On July 12, 1985, the court issued an order requiring "that each counsel prepare and submit findings of fact and conclusions of law no later than July 29, 1985." Both attorneys submitted proposed findings and conclusions. The court issued an under-advisement order dated August 30, 1985, affirming its previous ruling that appellant be certified as nonacceptable to adopt children. The order incorporated verbatim the proposed findings and conclusions of the court's appointed counsel:

## FINDINGS OF FACT

1. Petitioner, [appellant], filed a Petition for Preadoption Certification pursuant to A.R.S. Section 8–105 in the Pima County Superior Court.

2. Pursuant to A.R.S. Section 8–105, the Arizona Department of Economic Security prepared and submitted to this Court an investigative report which recommended certification of Petitioner for adoptive purposes.

3. This Court, pursuant to authority granted to it under A.R.S. Section 8–

105(I) certified petitioner as nonacceptable to adopt.

4. The Court exercised its right to require additional investigation pursuant to A.R.S. Section 8–106(J) and appointed George Haskel Curtis as counsel for investigative purposes.

5. Petitioner requested and participated in a certification hearing before this court on July 1, 1985.

6. Petitioner is a bi-sexual individual who has had, and may have in the future, sexual relationships with members of both sexes; he presently lives alone and is employed with [appellant's employer]; he has held at least eight different employment positions in eleven years; he has sought counseling for personal problems repeatedly in the last ten to eleven years; his family support system is limited at the present time.

### CONCLUSIONS OF LAW

1. The Petitioner is not acceptable to adopt a child at the present time.

Appellant timely filed his memorandum of points and authorities, and a responsive memorandum was submitted by the juvenile court's appointed attorney. We granted an application for permission to file a brief amicus curiae in support of appellant and accepted the brief submitted jointly by the Arizona Civil Liberties Foundation, the Lambda Legal Defense and Education Fund, and the Lesbian Rights Project. See Rule 16, Rules of Civil Appellate Procedure, 17A A.R.S.

On appeal, appellant contends that the juvenile court based its certification order solely upon his sexual orientation. He argues that the court's findings and conclusions were not supported by the evidence but were created improperly to sustain its determination of nonacceptability premised on his admitted bisexuality. Appellant also challenges the juvenile court's appointment of private counsel to represent the court

1. An agency other than the division may conduct investigations and submit reports. A.R.S. § 8–105(A) and (F). "Agency" may mean a person licensed by DES to place children for adop-

and the unknown class of potential adoptive children.

### I. APPOINTMENT OF COUNSEL

The court's designation of private counsel was characterized as an exercise of its right to require additional investigation pursuant to A.R.S. § 8–105(J). That statute authorizes a court to "require additional investigation ... if additional information is necessary upon which to make an appropriate decision regarding certification." Section 8–105(J) does not contemplate the appointment of adversary counsel but affords the court the opportunity, if necessary, to request further investigation and the presentation of additional facts which may be relevant and material to a pending petition for certification.[1]

Special appointments of counsel are governed by Rule 20, Rules of Procedure for the Juvenile Court, 17A A.R.S. Specifically, Rule 20(b) provides that "[t]he court may require the appearance of the County Attorney in the juvenile court as counsel to protect the public interest in any case." The appointment of private court counsel in this case was error; however, appellant has not shown and we do not find that he suffered any resulting prejudice. Appointed counsel added nothing to the evidence, and we do not believe that his presence affected the outcome of the review hearing. While appointed counsel did cross-examine appellant's witnesses, the court conducted extensive questioning on its own. The error in this case was harmless.

### II. FINDINGS AND CONCLUSIONS

In Arizona, no person may petition to adopt a particular child unless he has met certain statutory requirements. First, he must be certified by the court as acceptable to adopt children. A.R.S. § 8–105(A). Once a certification of acceptability is is-

tion, including an attorney or a law firm. A.R.S. § 8–101(2). There is no showing that appointed counsel in this case was such an "agency."

sued and the identity of the potential adoptive child is known, additional investigation and reporting are required to determine the suitability of that child's placement with the applicant. A.R.S. § 8–105(D). After the child's suitability for adoption by the applicant is determined, the petition to adopt is filed and may not be heard or disposed of for an additional six months to allow continued investigation. A.R.S. §§ 8–109, 8–112 and 8–113.

When a petition for certification is filed pursuant to A.R.S. § 8–105(A), an investigation is conducted and a report to the court is filed. The investigation may be conducted by the division, as in this case. A.R.S. § 8–105(B). The statute requires that the investigative report consider all relevant facts regarding an applicant's fitness to adopt including, without limitation, the applicant's social history, financial condition, moral fitness, religious background, physical health, mental health, fingerprint records and any prior court actions involving children. A.R.S. § 8–105(C). The report also must contain a "definite recommendation for certifying the applicant as being acceptable or nonacceptable." A.R.S. § 8–105(F).

The juvenile court, upon receiving the precertification report, "shall certify the applicant as being acceptable or nonacceptable to adopt children based on the investigation report and recommendations of such report." A.R.S. § 8–105(I). The investigation report which was filed by the division in this case recommended that appellant be certified as acceptable to adopt children.

The burden in adoption proceedings is proof by a preponderance of the evidence. Rule 17, Rules of Procedure for the Juvenile Court, 17A A.R.S. On review, we will not disturb the juvenile court's finding absent an abuse of discretion. *In re Anonymous,* 4 Ariz.App. 588, 422 P.2d 419 (1967). Where an investigation report filed pursuant to subsections 8–105(A), (C) and (F) recommends acceptability and the court rules otherwise, we will affirm if the evidence supports the conclusion that the applicant is not fit to adopt a child who might

be placed with him. Certification by the court of an applicant as nonacceptable constitutes a finding that at the present time, based on the record before the court, the applicant is not suitable to adopt a child.

■ In this case, the court specified the following circumstances and concluded that appellant was not acceptable to adopt children: That appellant is bisexual, that he lives alone and is employed, that he has had eight employment positions in 11 years; that he has sought personal counseling and that his family support system is limited.

The norm of appellate review of the record is whether it supports the trial court's ruling. Appellate courts do not reweigh the evidence, but rather only look to determine if there is evidence to sustain the ruling of the judge below. *State v. Veatch,* 132 Ariz. 394, 646 P.2d 297 (1982); *Matter of Appeal in Maricopa County Juvenile Action No. A–25525,* 136 Ariz. 528, 667 P.2d 228 (App.1983). We believe the dissent has strayed from this rule of appellate review and has taken a piecemeal approach resulting in dismantling the ruling. The trial court had the opportunity to observe the demeanor of the witnesses and gauge their credibility. Due regard must be given the trial court's findings of fact. *United Bank v. Mesa N.O. Nelson Company, Inc.,* 121 Ariz. 438, 590 P.2d 1384 (1979). The dissent would substitute its judgment for that of the trial court. We believe the record calls for deference to the factfinder.

■ The primary issue the court should consider when deciding whether to certify an applicant as suitable to adopt children is the best interest and welfare of any child who might be adopted by that person. The situation is akin to the problem before courts when determining custody or visitation as between natural parents, where the controlling standard is the best interest of the child. *Henning v. Henning,* 89 Ariz. 330, 362 P.2d 124 (1961); *Gowland v. Martin,* 21 Ariz.App. 495, 520 P.2d 1172 (1974). A fortiori, this criterion must control when considering adoption inasmuch as custody

and visitation determinations are subject to modification upon changing conditions, while single-parent adoptions are final with no subsequent available option of shifting custody between parents. Once an adoption is final, the sole means of reversal is by termination of parental rights—a remedy not lightly undertaken.

As the dissent correctly notes, the judge was concerned over a child's reaction in the future on learning of appellant's sexual orientation. Appellant testified that he would seek advice from professionals for guidance to deal with that issue. After the adoption has been completed, however, there is no method by which the court or any state agency could require that such guidance be sought by appellant.

The trial court's dissatisfaction with the division caseworker's written report is understandable. While appellant provided a W-2 wage and tax statement from his employer and confirmation of a salary increase during the hearing, the caseworker who conducted the adoptive home study was not aware of appellant's employment status at the time the study was prepared. His employment began in February 1984 and the home study was completed in May 1984, yet it does not mention his then-current employment status, indicating a somewhat less than thorough investigation.

In her testimony, the caseworker expressed doubts about appellant's support network. She stated that it would remain a continuing concern even through placement if appellant were certified. The caseworker also testified that she did not have any information about the cause or degree of depression appellant suffered in 1973 and 1974. Appellant testified concerning that period of depression, but the caseworker did not follow up on appellant's mention of it in his autobiography.

It is apparent after considering all of the caseworker's reports and testimony that she recommended the certification largely because, although she recognized that appellant had problems that might affect his ability to be a good parent, he, like she, was experienced in counseling and his

promise to seek counseling would resolve future problems in the relationship with the adoptive child. We share the trial judge's concern that seeking counseling per se will not resolve all the potential problems that may occur once a child is placed with appellant. We defer to the trial court.

The amicus brief centers its argument on the self-presumed fact that the trial court based its decision solely on appellant's sexual orientation. The dissent also maintains that appellant's bisexuality was the sole reason for the denial of his petition to be certified as acceptable to adopt children. We disagree. As we have stated, we find ample evidence to support the trial court without examining that issue.

■ However, we believe appellant's ambivalence in his sexual preference was very appropriately a concern of the court. As we have stated previously, the primary concern of the court, to the exclusion of all else, is the best interest and welfare of any child. Certainly the sexual orientation of one who petitions to be certified as acceptable to adopt a child is a factor to be reviewed and evaluated by the court. Certification of acceptability for adoption should not be lightly undertaken. While a second hearing is required before a child may be adopted, the judge before whom such hearing is held may be expected to place considerable reliance upon the certification hearing.

We note the cases cited by the dissent wherein the sexual orientation of a parent was not a sufficient factor to change custody or alter visitation rights. There are an equal number of cases wherein the courts did change the custody of minor children or alter visitation because of a parent's sexual activity. See *Chaffin v. Frye*, 45 Cal. App.3d 39, 119 Cal.Rptr. 22 (1975); *S. v. S.*, 608 S.W.2d 64 (Ky.App.1980); *Irish v. Irish*, 102 Mich.App. 75, 300 N.W.2d 739 (1980); *J.L.P. (H) v. D.J.P.*, 643 S.W.2d 865 (Mo.App.1982); *L. v. D.*, 630 S.W.2d 240 (Mo.App.1982); *N.K.M. v. L.E.M.*, 606 S.W.2d 179 (Mo.App.1980); *In the Matter of J.S. & C.*, 129 N.J.Super. 486, 324 A.2d 90 (1974); *In re Jane B.*, 85 Misc.2d 515,

380 N.Y.S.2d 848 (1976); *Jacobson v. Jacobson*, 314 N.W.2d 78 (N.D.1981); *Roberts v. Roberts*, 22 Ohio App.3d 127, 489 N.E.2d 1067 (1985); *M.J.P. v. J.G.P.*, 640 P.2d 966 (Okla.1982); *Constant A. v. Paul C.A.*, 344 Pa.Super. 49, 496 A.2d 1 (1985); *Bennett v. O'Rourke*, (Tenn.App., filed 11/5/85) [Available on WESTLAW, TN–CS database]; *Roe v. Roe*, 228 Va. 722, 324 S.E.2d 691 (1985).

■ The fact that appellant is bisexual is not unlawful nor, standing alone, does it render him unfit to be a parent. It is homosexual conduct which is proscribed. A.R.S. §§ 13–1411 and 13–1412. Such statutes have been held constitutional. *Bowers v. Hardwick*, —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

Appellant testified that it was possible that he at some future time would have some type of homosexual relationship with another man even with placement of a child in his home. He also testified that he did not believe the possibility of continued homosexual activity would have an adverse affect on a child that he might adopt. It would be anomalous for the state on the one hand to declare homosexual conduct unlawful and on the other create a parent after that proscribed model, in effect approving that standard, inimical to the natural family, as head of a state-created family. The trial court may have been dissatisfied with the showing with reference to appellant's conduct as distinguished from his homosexual predisposition.

Considering the record in the light most favorable to the trial court's ruling, we affirm.

Affirmed.

FERNANDEZ, J., concurs.

HOWARD, Presiding Judge, dissenting.

The majority cloaks its opinion with "due regard" for the trial court's findings of fact and with the "norm of appellate review." Like the trial court, the majority gives credence to unsupported findings, and refuses to acknowledge the sole reason for its ruling: the fact of appellant's bisex-

uality. The majority states that it is unnecessary to examine that issue and simultaneously holds that the state may not "create" a family with a homosexual parent. Considering the record in the light most favorable to the trial court's ruling, its conclusion is not supported by the findings and the findings are not supported by the testimony and evidence. I am accused by the majority of weighing the evidence. That is not true because there is nothing to weigh. All the evidence was in favor of the appellant. It is clear from the record that both the trial judge and the majority of this department have no intention of ever letting a bisexual adopt a child. I refuse to participate in such a decision. I, therefore, set forth the facts which merit a reversal of the trial court's order.

Appellant seeks to adopt an older child of at least elementary school age. He testified that he would have no problem arranging suitable supervision for a child during times when the child would not be in school and appellant would be at his place of employment. He also testified that his employment situation is flexible enough to allow for care of a school-age child. The evidence that appellant lives alone and is employed does not support a conclusion that he is nonacceptable to adopt any child, particularly of a child old enough to attend school.

Nor is the lack of a local family support system conclusive evidence of parental unsuitability. Appellant testified that he does spend time with his nieces and nephews who live outside Arizona and that, while most of his family members reside out of state, they are available as part of his support network. The division report acknowledged that appellant is without a "nearby extended family" but stated that his support network of friends offsets those circumstances. The caseworker testified that the immediate and supportive responses from his references further countered appellant's lack of a local family network. Furthermore, one witness, appellant's close friend for over 20 years and a husband-father, testified that appellant

spends a considerable amount of time with his family, babysits his small children, and is to be named as alternate guardian of his children in his will. The evidence does not support a finding that appellant is unacceptable to adopt children because his family members reside outside Arizona.

The division caseworker also testified that in some instances, placement of a child with a single parent is important, particularly where that child has experienced prior disruptions in a two-parent home or is for some reason unable to deal with more than one authority figure or parental relationship at a time. She also testified that during the pendency of appellant's petition for certification, three children available through the division would have been appropriate for placement with the appellant.

The court's finding that appellant has had "eight different employment positions in eleven years" implies financial instability and/or employment instability. The records of appellant's financial condition do not support such an implication, nor does the evidence regarding his employment history render appellant nonacceptable. Following four years of Air Force service, college both in Los Angeles and at the University of Arizona, and various employment positions outside Arizona, appellant returned to Tucson, taught part-time and then full-time at Pima Community College, engaged in business as a self-employed service management consultant/lecturer/workshop leader and, since February 1984, has been employed by the local office of a large, publicly-traded technological firm as its national service manager. The majority's opinion focuses on the fact that appellant's current employment is not mentioned in the home study. The caseworker testified that appellant had notified her of his new job and requested that the home study be updated and that she was aware that he would likely be changing employment when the study was completed.

Appellant's salary was increased on August 1, 1985, to $32,240 annually. The division caseworker testified that appellant's financial condition was much better, even prior to his current employment, than that of many applicant families. She also testified that changes in employment within a particular career, such as those changes made by appellant, do not render an applicant nonacceptable and do not lead to an automatic conclusion that employment or financial status renders appellant unsuitable to adopt children. Contrary to the majority's statement that appellant's past and present employment was undocumented, there is ample testimony and evidence of employment and financial stability. Admitted into evidence were documents establishing appellant's self-employment endeavors, his contract with and earnings from Pima College, his 1984 W-2 wage and tax statement from his current employer and a written confirmation of his salary increase to $32,240 on August 1, 1985, rating his overall performance as "outstanding."

Appellant testified that immediately following his honorable discharge from the Air Force 12 years earlier, he saw a therapist/counselor for approximately three months from November 1973 to January 1974 for post-service depression and to process the termination of a relationship. The caseworker determined that the short period of counseling 12 years ago did not affect appellant's parenting ability and appellant testified concerning that time. There was no evidence to support the court's finding that he has "sought counseling for personal problems repeatedly in the last ten to eleven years" or the implication that he may be mentally unfit. Rather, appellant testified: "I talk to my friends, and some of them are qualified peer counselors and the like. I occasionally, probably two or three times a year, make an appointment with a pastoral counselor, to talk about what's going on in my life and whether it's heading the way I want it to." Appellant is experienced in counseling. He has experience as a crisis hot-line listener both in Los Angeles and at the University of Arizona. He has participated as a trainer in a peer counseling program at the University and is involved as a big brother in the Big Brothers of Tucson organization. The divi-

sion caseworker testified that appellant's periodic personal counseling is professionally responsible, particularly since he counsels others. Contrary to the majority's opinion, the caseworker never recognized or testified that appellant had problems that might affect his ability to be a good parent. Appellant testified that he has never taken medication or received in-patient mental health treatment and that he suffers no mental health problems.[2] The evidence does not support the court's finding or the implication that appellant's mental health renders him unfit to adopt a child.

The court found that appellant "is a bisexual individual who has had, and may have in the future, sexual relationships with members of both sexes." The court's comments at the review hearing and the questions which the judge directed to appellant and the other witnesses focused mainly on appellant's sexual orientation. The judge expressed concern with three main topics: whether appellant would "proselytize" homosexuality to a child and whether he is involved in gay rights organizations; whether an appropriate parent-child bond could be created with a bisexual or homosexual adoptive parent; and whether appellant's interest in children includes an unnatural or abnormal sexual interest or intent.

The witnesses testified that appellant is not overtly sexual, is not promiscuously or flamboyantly homosexual, does not frequent any bars, and is not active in gay rights groups. Appellant testified that he believes it is inappropriate to display sexual activities in front of children or to influence a child's sexual orientation in the manner suggested by the court. The division caseworker pointed out that published studies conclude that children have established

their own sexual preference by the age of three years. The court's concerns regarding activism or proselytizing were not borne out by the evidence in this case.

At one point during the review hearing, the judge stated: "I'm more concerned with the bonding or whatever you want to call it, relationship that might ultimately exist or not exist because of the sexual situation." Many of the questions asked by the judge showed a concern for a child's future reaction to discovering or realizing that his adoptive parent is bisexual. Appellant testified that once a particular child has been placed with him, he intends to seek the advice of skilled professionals for guidance to deal properly with that particular issue. The division caseworker testified that appellant is capable of providing a proper approach to the issue and is a good role model for learning how to handle sexual issues in general in a responsible manner. She also testified that, depending on the individual child's age, prior experience and personality, a discussion of the matter with the child prior to adoption would be possible.

A social worker and director of specialized mental health services at La Frontera with 26 years of counseling experience, who is a personal friend of appellant, testified that she has given opinions in a professional capacity as to the propriety of adoptive placement. In response to the court's questioning about a child's reaction to appellant's bisexuality, she testified that a child's future reaction to discovering appellant's sexual orientation would depend on the parent-child relationship which was established from the original time of placement and that the ultimate answers to the court's questions could be made only after appellant was matched with a particular

2. In 1973 the American Psychiatric Association removed homosexuality from its list of psychic disorders, resolving that "homosexuality per se implies no impairment in judgment, stability, reliability or general social or vocational capabilities" and that "in the reasoned judgment of most American psychiatrists today, homosexuality per se does not constitute any form of mental disease." American Psychiatric Association, D.S.M. III: *Diagnostic and Statistical Manual of Mental Disorders*, 281–82, 380 (3d ed. 1980). The National Association of Mental Health and the United States Surgeon General have also recognized that homosexuality constitutes no form of mental or emotional illness. California Commission on Personal Privacy, *Report of the Commission on Personal Privacy*, 361–63 (1963).

potential adoptive child. She and the caseworker both emphasized the process of matching parent and child, that being "the beauty of adoption, the adult and child both have an opportunity to make the very best match."

The court also inquired of appellant whether his "relationship with any adoptive child would be essentially or totally asexual," and further asked, "Do you feel that you have any unusual urge or any unusual sexual attraction to younger boys? Do you feel the absence of any urge towards younger boys? Have you ever had any psychological tests that were intended to assess that relationship between you and younger boys?" Finally, the court requested of the social worker who testified that there are no such tests:

> THE COURT: So I'd ask you to get back to me on—after you specifically contact psychologists, with whatever information you have, about whether there's any tests that they think would be helpful in assessing any abnormal tendencies toward children.

There is no evidence to support the court's comments regarding sexual interest in children or the conclusion that a bisexual or homosexual person is more likely to harbor such abnormal intent than a heterosexual. In fact, as the caseworker testified, there is no correlation between pedophiles and either heterosexuality or homosexuality. In addition, the majority of crimes committed by adults upon children are heterosexual and the vast majority of sexual acts committed upon children are committed by adult heterosexual males. *See Baker v. Wade*, 553 F.Supp. 1121, 1130 (N.D.Tex. 1982), *rev'd on other grounds*, 769 F.2d 289 (5th Cir.1985) (citing Sam Houston State University Criminal Justice Center, *Responding to Child Sexual Abuse; A Report to the 67th Session of the Texas Legislature* (1980)).[3] There is nothing in the record to support a concern in this area. Appellant's past experience in a fos-

ter child situation was investigated by the division caseworker and revealed no unusual or abnormal sexual attraction. As noted above, a friend of appellant's for more than 20 years who is the father of two young boys testified that appellant regularly babysits his children and that he and his wife have chosen to designate appellant as the legal guardian of their sons in the event such appointment by will would become necessary. Appellant has been accepted by and participates in the Big Brothers of Tucson organization and has had a "little brother" assigned to him since early 1985.

At the review hearing, the juvenile court judge implied that the social worker had "buried" the topic of appellant's sexual preference in her report and that had the Pima County Attorney closely reviewed that report to discover the information, he would not have filed the original petition for certification. The judge commented:

> THE COURT: You know, to be frank about it, I read the case report, and I felt that I had to look sort of hard for the fact that [the appellant] was bisexual as described in the report. I mean I can see some busy caseworker reading through reports and not catching that in this case.

*   *   *   *   *   *

> THE COURT: Well, I don't guess this is the time, or perhaps it warrants saying, on the other hand, at this time. I feel that it's a major concern, and even if I could express the thought, if you felt otherwise, I don't think that if you were aware of the fact that it was sort of tough to weigh, that that would warrant tucking it away. I don't feel that it does. That's not to say that you premeditatedly did it, unless you acknowledge that at this point, but I felt—I mean, for example, I think the county attorney's office, who filed the original application, was

---

3. The brief of the amici curiae also cites American Humane Association, Children's Division, *Protecting the Child Victim of Sex Crimes Committed by Adults*, 216–17 (V. DeFrancis ed.

1969), which concluded that 97 percent of sex offenders against children are male and 90 percent of the victims are female.

unaware of the fact of [appellant's] sexual preferences, but let's move on.

\* \* \* \* \* \*

THE COURT: And if someone of—were of like mind to you, Ms. Alexander [division social worker], and thought that the sexual aspects of the case weren't important, that caseworker would, in likelihood, not bring to the attention of the judge [hearing actual placement] the situation; is that correct?

In response to the court's suggestions that a "busy" reader of the home study might not notice the discussion of appellant's sexuality, the division caseworker stated:

Not to dispute, Your Honor, but I don't believe that's [the] practice within the department, in any part of the state, particularly when we're considering placing with a single parent. There has been a good deal of discussion about the appropriateness of single parents statewide, and I have been ... [a] member of those bodies that make—that have engaged in such discussion, and it's thought that there needs to be a pretty strong justification for electing a single parent home. So, in practice, I believe that the studies are more carefully scrutinized than others.

As to finding that particular point, I had satisfied myself that it [appellant's bisexuality] was not the major concern about [appellant].

The court also questioned the caseworker regarding her observations and investigation of appellant's lifestyle. She testified:

I have not seen his name, in connection with gay rights movement, in the newspapers, I—in the several times I made visits to his home, it appeared that—that there were no efforts to stage manage such visits, the home appeared the same on each visit, so that suggests to my mind that the things he was telling me were consistent with the evidence available in the home. We were not interrupted by telephone calls. That may sound irrelevant, Your Honor, but it has been my experience, in efforts to conduct other home studies, that, there'll be repeated interruptions and the way the applicant responds to such interruptions indicates to me something of the priority they give to what they're undertaking. [Appellant] always made certain that the time that I spent in interview with him was totally available for the interview. Over time, there have been no negative allegations suggested with regard to [appellant], and now, it has been over two years since he made application.

From the record and the testimony, it is clear that the caseworker did not take a cavalier attitude in appellant's case, nor did she fail to investigate thoroughly. The court implied that she had somehow hidden the fact of appellant's sexual preference in the home study report and the following occurred at the hearing while the division caseworker testified:

Q. Since the court has an obvious concern about this particular issue of [appellant's] sexuality, is there any method by which DES could note in a prominent way on [appellant's] chart that he has expressed his bisexuality so that a child would not be placed with him without the placing worker being aware of that fact?

A. Well, I hesitate to make exception of [appellant] in our usual categories of description. Perhaps under the category of marriage, it should be—might be included, however, not all homosexual persons remain single.

THE COURT: ... if we get to it, I would think that a court order, before the placement, any placement in the matter be brought to the attention of the presiding judge might deal with that issue.

THE WITNESS: Your Honor, I will note in my category about marriage, the second paragraph, indeed, declares that [appellant] has come to terms with his own bisexuality. As far as establishing a separate category to deal with it, it would seem indicated then that we would need to do this for married couples as well applying.

The issue of appellant's bisexuality was presented in the home study report under the section generally labeled "marriage," but which the caseworker testified is the category used by the division to discuss the sexuality of single applicants. There is no showing, as the court suggested, that the county attorney was unaware of appellant's bisexuality.

Although the court appointed its own attorney in contravention of Rule 20, Rules of Procedure for the Juvenile Court,[4] that attorney presented no evidence and did not show in any way that the home study prepared in this case and the investigation conducted by the division caseworker fell below the standard DES investigation and reporting procedures.

The majority opinion states that sexual orientation is a factor to be reviewed and evaluated in preadoption certification proceedings. The division caseworker who conducted the investigation testified that as to unmarried applicants, the division does determine sexual preference but that there is no policy to recommend or not recommend an applicant solely because he or she has been identified as a bisexual or homosexual. She testified that the division looks generally to whether an applicant's behavior, lifestyle and character would impact adversely on a particular child. In other words, an applicant will not be rejected solely on the basis of sexual orientation; rather, the inquiry focuses on style of living, honesty, integrity, stability of living, strong employment and other general character considerations. The social worker testified that such concerns would apply to any applicant, acknowledging as an example an unmarried heterosexual female applicant who "lives a fast life" and conducts relationships with many men. The inquiry as to sexuality focuses generally, on promiscuity and flamboyancy in any situation, not merely in cases of identified homosexual or bisexual applicants. She noted that professionals in a multi-state training workshop concluded that homosexuality per se does not impact adversely on the

success or failure of an adoptive parent. She also commended appellant's honesty and frankness in discussing his life and sexuality with her openly and without repeated questioning as is necessary with some applicants:

> [H]e struck me from the outset of our home interviews as being among the most candid candidate-applicant I've ever encountered, and ... at the conclusion of the study, I felt that I had a stronger sense of this man's character, morality, and maturity than I do most of the clients.

She described appellant "as being a very mature individual who has resolved significant issues in his own life, has high standards in several areas of his life, and a strong commitment to become a parent to a child." She testified that she has had experience with a number of single-parent adoptions during her five years as a caseworker in the adoption unit and that appellant would be a good parent and role model for a child properly placed with him.

While there is no case law particularly applicable to the situation at hand, I believe the proper rule to be that homosexuality or bisexuality standing alone does not render an applicant unfit as a matter of law to adopt children. That is not to say, however, that every homosexual or bisexual is acceptable to adopt. The case-by-case approach to investigating adoptive applicants may reveal circumstances, as the division caseworker testified, which render an applicant nonacceptable. *Cf. In re J.S. & C.,* 129 N.J.Super. 486, 324 A.2d 90 (1974) (homosexual father's visitation with minor children restricted where evidence established that father attended gay rights marches with his children and was a leader of a gay rights activist organization).

The law governing child custody provides guidance. In the most recent state supreme court pronouncement on the issue, the Alaska court reversed an order changing custody of a minor child from mother to father stating:

**4.** I agree with the majority's disposition of the issue regarding appointment of counsel.

In marked contrast to the wealth of testimony that Mother is a lesbian, there is no suggestion that this has or is likely to affect the child adversely.... Simply put, it is impermissible to rely on any real or imagined social stigma attaching to Mother's status as a lesbian.... Consideration of a parent's conduct is appropriate only when the evidence supports a finding that a parent's conduct has or reasonably will have an adverse impact on the child and his best interests.

*S.N.E. v. R.L.B.*, 699 P.2d 875, 879 (Alaska 1985). In *Bezio v. Patenaude*, 381 Mass. 563, 579, 410 N.E.2d 1207, 1216 (1980), the court held:

In the total absence of evidence suggesting a correlation between the mother's homosexuality and her fitness as a parent, we believe the judge's finding that a lesbian household would adversely affect the children to be without basis in the record. This is not a matter about which the judge could take judicial notice.

*See also Nadler v. Superior Court*, 255 Cal.App.2d 523, 63 Cal.Rptr. 352, 354 (1967) (court reversed custody order which was based on homosexuality, holding that "the trial court failed in its duty to exercise the very discretion with which it is vested by holding as a matter of law that petitioner was an unfit mother on the basis that she is a homosexual"); *D.H. v. J.H.*, 418 N.E.2d 286, 293 (Ind.App.1981) (affirmed award of custody of minor children to husband where there was evidence to support the award irrespective of any evidence of wife's homosexuality. "[W]e believe the proper rule to be that homosexuality standing alone without evidence of any adverse effect upon the welfare of the child does not render the homosexual parent unfit as a matter of law to have custody of the child"); *People v. Brown*, 49 Mich.App. 358, 364, 212 N.W.2d 55, 59 (1973) (appellate court reversed probate court's order placing children of lesbian mothers in foster homes. "There was sufficient evidence

to support the conclusion that the women were engaged in a lesbian relationship. However, there is very little to support the conclusion that this relationship rendered the home an unfit place for the children to reside"); *M.P. v. S.P.*, 169 N.J.Super. 425, 432, 404 A.2d 1256, 1260 (1979) (court reversed change of custody from mother to father where "the custody order was modified for the sole reason that she was a homosexual and without regard to the welfare of the children"); *Doe v. Doe*, 222 Va. 736, 746–49, 284 S.E.2d 799, 805, 806 (1981) (father and new stepmother petitioned to allow stepmother to adopt child of father without consent of natural mother; order granting petition was reversed on appeal. "If Jane Doe is an unfit parent, it is solely her lesbian relationship which renders her unfit, and this must be to such an extent as to make the continuance of the parent-child relationship heretofore existing between her and her son detrimental to the child's welfare. The petitioners introduced no evidence, scientific or otherwise, to establish this fact. Regardless of how offensive we may find Jane's life-style, its effect on her son's welfare is not a matter of which we can take judicial notice.... We decline to hold that every lesbian mother or homosexual father is *per se* an unfit parent"); *In re Marriage of Cabalquinto*, 100 Wash.2d 325, 330, 669 P.2d 886, 888 (1983) (appellate court reversed trial court's denial of divorced father's request for visitation with son in another state. "Homosexuality in and of itself is not a bar to custody or to reasonable rights to visitation.... Visitation rights must be determined with reference to the needs of the child rather than the sexual preferences of the parent").

The majority cites a recent United States Supreme Court decision for the proposition that A.R.S. §§ 13–1411 and 13–1412 constitutionally proscribe homosexual conduct.[5] It then concludes that the state may not "create" a family with a parent who has in the past, or may be in the future, engaged in such unlawful conduct. If an applicant's

---

**5.** *Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), *vacating* 760 F.2d

1202 (11th Cir.1985).

participation or potential participation in unlawful sexual practices may provide a valid basis for certifying an applicant as nonacceptable to adopt, then, in keeping with the majority's guidelines and the pronouncement of the Arizona Supreme Court,[6] it must be imperative that the juvenile court inquire into every applicant's conduct, past and future, with regard to the proscriptions of A.R.S. §§ 13–1408 (adultery) and 13–1409 (open and notorious cohabitation or adultery). Moreover, the inquiry must include extensive questioning of every applicant, regardless of marital status and sexual preference, to determine whether his or her sexual practices violate A.R.S. §§ 13–1411 and 13–1412.

There may be circumstances in the precertification investigation, such as flamboyance or promiscuity, which render an applicant nonacceptable to adopt children. However, the mere fact of appellant's bisexuality does not render him nonacceptable to adopt any children as a matter of law. Furthermore, based upon the division's investigation report, the testimony of the division caseworker, the other witnesses and the evidence, I believe that the juvenile court erred in concluding that appellant is nonacceptable for certification to adopt a child, because there was no evidence to support a finding of any negative circumstances relating to appellant's bisexuality in this case.

Absent traits of lifestyle habits, such as overt sexuality or promiscuity, sexual preference alone should not be determinative of an application for preadoption certification. In appellant's case, as both experienced social workers testified, the inquiry must focus on an individual child to determine "the best match" and to determine whether his sexual orientation will or may adversely impact upon that particular child.

Stating the primary issue in this case as "the best interest and welfare of any child who might be adopted," and comparing the situation to custody and visitation determinations, the majority concludes that there is no child whom appellant may adopt. These are preadoption certification proceedings. Under the circumstances of this case, until there is a particular child and a petition to adopt that child, I do not believe that these standards apply. The scrutiny of a child-applicant match will determine the propriety of adoption in this case. At that stage, expert testimony and scientific evidence may be necessary. The strict statutory requirements applicable to the process of placement and adoption provide adequate assurance that the best interests of a particular potential adoptive child vis-a-vis the adoptive parent will be considered and protected. A hearing by the court is required after a petition to adopt has been filed, A.R.S. § 8–111, and another social study is prepared. A.R.S. § 8–112.

The division caseworker testified that single parent adoptions are, by their nature, more closely scrutinized. She also testified that an additional level of investigation or judicial contact will occur because appellant wishes to adopt an older child. The vast majority of older children available for adoption are the product of dependency or neglect proceedings, and placement of those children in a foster home or potential adoptive home requires the approval of the juvenile court and the foster care review board.

I would vacate the order of the juvenile court with directions to enter an order certifying appellant as acceptable to adopt children pursuant to A.R.S. § 8–105(A). At the very least, in view of the majority's concern for a more detailed report, the matter should be remanded for additional evidentiary proceedings.

---

**6.** Without limitation to homosexual conduct, the Arizona Supreme Court has held that this state's statutory proscription of lewd and lascivious acts and sodomy constitutes proper legislative regulation of moral welfare and, therefore, does not violate the specific right of privacy guaranteed by our own constitution in Article 2, § 8. *State v. Bateman,* 113 Ariz. 107, 111, 547 P.2d 6, 10 (1976), *cert. denied,* 429 U.S. 864, 97 S.Ct. 170, 50 L.Ed.2d 143.