Sandy K. WILLIAMS, Plaintiff
and Appellee,

v.

Barney D. WILLIAMS, Defendant
and Appellant.

No. 15940.

Supreme Court of South Dakota.

Considered on Briefs March 24, 1988.

Decided June 22, 1988.

Robert W. Gunderson of Gunderson, Farrar, Aldrich & DeMersseman, Rapid City, for plaintiff and appellee.

Harvey A. Oliver of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, for defendant and appellant.

MILLER, Justice.

This is an appeal from a circuit court order denying a motion to change custody of minor children. Concluding that there was insufficient evidence to allow the trial court to make a meaningful determination as to the best interests of the children, we reverse and remand for further proceedings.

## FACTS

Sandy K. Williams (Mother) and Barney D. Williams (Father) were married on September 24, 1977. Born to that union were two daughters, whose present ages are nine and ten. The marriage was terminated by a judgment and decree of divorce dated January 20, 1983. This divorce decree, which determined that both parties were fit parents, approved an agreement of the parties wherein the "physical and residential care" of the children was given to Mother "with parental access and parental rights of hearing" to Father.[1] Father was required to pay monthly child support in the amount of $150 ($75 per month per child).

Subsequent to the divorce, Father failed, neglected or refused to pay the child support required of him. After an order to show cause hearing in October, 1984, the court found him to be $2800 in arrears, held him in contempt and ordered that the support obligation be increased to $175 monthly, with $25 to apply towards the arrearages. At some later time, under SDCL 25–7A–22, Mother sought an increase in support from the Department of Social Services (DSS). After a hearing on that request, the DSS hearing officer, on December 5, 1986, denied the requested increase, continued the $150 per month payment previously ordered by the circuit court and noted that if Father again became delinquent, Mother could proceed to obtain an "Order of Withholding." Although the record is silent as to the specifics, it does appear that Father continued to be delinquent and other proceedings were conducted, since in his testimony in the current proceedings he testified that the support was being withheld from his paycheck by his employer.

In August, 1987, Father filed a motion seeking custody of the children. In affidavits regarding the motion, the parties made various serious allegations against each other.

The trial court conducted an evidentiary hearing on the motion on August 27, 1987. During Father's case-in-chief, he testified and, through his attorney, conducted an adverse examination of Mother. The only other witness was a former boyfriend of Mother. At the close of Father's evidence, Mother's counsel, "reserving the right to call some witnesses," moved for dismissal. That motion was granted and the trial court later entered a written order denying change of custody and allowing Father "reasonable" visitation rights. This appeal followed.

## DECISION

As is too often the case in actions such as this, the parties concentrated more on demeaning each other's conduct than they did in addressing the real issue, namely the best interests of the children. As will be alluded to later, they placed the trial court

---

1. In the decree, the court specified several provisos, including that: father would get "extremely reasonable and liberal visitation rights"; father would have visitation two nights during each week during the evening hours; father would have visitation on alternating weekends and various holidays; father should receive continuous six weeks' summer visitation (which he never exercised); neither would move out of the City of Aberdeen without first giving sixty days advance written notice by certified mail and if the parties could not reach a voluntary agreement concerning change of residence the matter would be submitted to the court; the parties would consult with each other frequently in an attempt to mutually agree regarding the general health, welfare, education, and development of the children; they would not attempt or condone any conduct or action to estrange the children from the other party; they would encourage and foster respect and affection in the children for both parents; they would keep each other advised as to any serious illness or other major development with respect to the children; they would keep each other advised of each other's residence and business address and whereabouts on vacation.

in the position of attempting to ascertain which parent is "the least worst."

Mother's conduct was clearly flawed. Her character and fitness as a parent are obviously tarnished by the following: she has lived with and/or had sexual relationships with a number of men while the children were in the home; two of these boyfriends were convicted felons (one for burglary and another for dealing in drugs); one of her live-in boyfriends abused her, often in the presence of the children, yet she continued to reside with him after the abuse; she has admitted to abusing the children, including kicking them and on one occasion blackening both eyes of one of the daughters; she has neglected the children by occasionally leaving them unattended, even while they were ill; she relied heavily upon the Boys and Girls Club to help raise the children by having them go there daily after school, even to the extent of sometimes eating meals there; she has had a very transient existence, having lived in twelve different residences in four cities including Aberdeen, Sioux Falls, Chelsea, and currently in Hill City, South Dakota.

By the same token, Father's conduct has been far from exemplary. Among other things, he did not pay child support. Even were we to accept his argument that Mother had agreed (prior to the divorce) to waive support in order to get the kids, his conduct cannot be excused or condoned, morally, legally or in any manner, especially in view of the record before us. Further, just as Mother had a remedy to collect support, he had a remedy to have it modified, which he never attempted. He attempts to excuse his delinquencies by virtue of the extensive visitation he exercised; however, that visitation period is identical to that which was considered and provided for in the original decree of divorce.

Additionally, Father himself had a "live-in" girl friend, who he now plans to marry. The fact that she no longer lives in the home (and will not until after their marriage) does little to minimize his indiscretion. It was clearly established that she moved out shortly before the modification hearing in order to make him look better to the judge. Nonetheless, since Father has maintained his employment with one employer and has purchased and remodeled a house, he could perhaps provide the more stable environment for the children.

Unfortunately, there was no testimony offered from the children or from disinterested persons relating to the well-being of the children or their best interests. No testimony was offered from any teachers, social workers, babysitters, personnel of the Boys and Girls Club or the grandparents. There was no homestudy conducted by DSS or any other social agency.

The trial court was obviously frustrated by the state of the record, as evidenced by its statement at the close of the hearing, as follows:

Well, here's the situation in my mind: both parents have exhibited immoral conduct.

Now, so I don't have to start equating whose immorality is higher than the others—that's sometimes hard to do—can you be immoral with one person or does it take more than one person to be immoral with? Now, she's got, apparently in numbers, more than the defendant. Starting on that premise they're both immoral, I think that's pretty well stated, and probably the children should be taken away and put in a foster home, but there's no dependency and neglect proceeding in front of the Court so I can't do that. So I've got to put the children in an immoral home either way I go. So on that premise, then, we go to the other area, which is, she moved sixteen times in so many years.

But I have to equate that with something else; and that is that economics has a lot to do with where you go and why you stay. The testimony has been, it's unrefuted that he didn't pay his child support, so she was in financial problems with the two children. So I really don't see where there's that much change. There's been no showing except for this one incident where the children have two black eyes, and she's admitted to that but there's been nothing else; that they're in jeopardy, or that they would be in better hands

with the father. So I feel that there has not been substantial evidence presented to this court that I should change custody.

Irrespective of whether we agree or disagree with the trial court's characterization of the "immoral" conduct, we believe it missed the point, namely *what is truly in the best interests of the children.*

■ We must start from the basic premise that when a divorce decree is based on an agreement of the parties, the issue of custody may be considered in a subsequent custody modification hearing without the "substantial change of circumstances" constraints. *Hansen v. Hansen,* 327 N.W.2d 47 (S.D.1982); *Kolb v. Kolb,* 324 N.W.2d 279 (S.D.1982). Thus, the party seeking modification must show that the best interests and welfare of the children requires a change of custody. *Flint v. Flint,* 334 N.W.2d 680 (S.D.1983); *Kolb, supra.* In our review, we must ascertain whether the trial court has clearly abused its discretion. *Flint, supra; Hansen, supra; Kolb, supra;* SDCL 25-4-45. However, the trial court's exercise of discretion is not uncontrolled and must have a sound and substantial basis in the testimony. *Kester v. Kester,* 257 N.W.2d 731 (S.D.1977).

■ Considering the state of the record, we conclude that Father has met his prima facie burden of proof and therefore the trial court abused its discretion in concluding that the children's best interests required that they remain with Mother. Even if Father's relationship with his fiancee is characterized as immoral, immoral conduct per se does not make him unfit to have custody. *Spaulding v. Spaulding,* 278 N.W.2d 639 (S.D.1979). Not only are Mother's elicit relationships more serious, *Rivers v. Rivers,* 322 N.W.2d 864 (S.D. 1982); *Spaulding, supra,* but the frequent moves and transient lifestyle, as well, are not in the children's best interests. *Jasper v. Jasper,* 351 N.W.2d 114 (S.D.1984). Nor can we condone Mother's exposing the children to men of questionable character, to-wit: two convicted felons and one physical abuser. Further, despite the trial court's comments, we must add that there is nothing in the record to support the fact that Father's unexcused failure to pay child support in any manner influenced Mother's transient lifestyle or other conduct.

■ Counsel, in cases such as this, have an obligation to establish by appropriate means that the best interests of the children are served by placing them with their client. Although presenting a prima facie case, Father's counsel did not fully fulfill that obligation because his principal reliance was on the testimony of the parties. However, in these important cases, when trial lawyers fail to fulfill this obligation, trial courts, in their role of parens patriae of the children, must insist that more be done. As stated in *Jasper:* "It is the trial court's duty to see that the children are protected at every turn ... The parents' personal wishes and desires must yield to what the court in the discharge of its duty regards as the children's best interest." 351 N.W.2d at 117 (citations omitted). At the very least, trial courts have the authority, and at times the obligation, to require a homestudy of both parents, so it can be assured that the children are not placed, or do not remain, in surroundings seriously detrimental to their well-being. *See Garnos v. Garnos,* 376 N.W.2d 571 (S.D.1985); *Karim v. Karim,* 290 N.W.2d 479 (S.D.1980). In addition, the court may, in its discretion, call and interrogate witnesses. *Haugen v. Haugen,* 82 Wis.2d 411, 262 N.W.2d 769 (1978); SDCL 19-14-26 and 19-14-27.[2]

We therefore reverse and remand this case to the circuit court for further proceedings consistent herewith.

WUEST, C.J., and MORGAN, J., concur.

---

**2.** SDCL 19-14-26 provides: "The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."

SDCL 19-14-27 provides: "The court may interrogate witnesses, whether called by itself or by a party. This power shall be used sparingly and only when the interests of justice require."

SABERS, J., concurs in result.

HENDERSON, J., concurs in result in part and dissents in part.

SABERS, Justice (concurring in result).

I concur in the result of the majority opinion and in the spirit of Justice Henderson's special writing.

HENDERSON, Justice (concurring in result in part; dissenting in part).

It is fully understood that we are remanding for a further reexamination by the circuit court judge.

This case was decided without the Mother ever having an opportunity to present her evidence, due to the trial court's granting of Mother's motion to dismiss. Obviously, the Mother should now be given an opportunity to refute the allegations made against her by her ex-husband and present her entire side of this case. Therefore, the majority's opinion is prematurely slanted against Mother. It is rather axiomatic that both sides of a case be heard before the facts be found. Concededly, it was Mother's motion to dismiss which unilaterally estopped her from presenting her entire evidentiary showing. The trial court, after holding further proceedings, should base its decision on the whole body of the evidence, as it develops. We are not the fact finders.

I note 30 pages of single-spaced, typewritten material appended to the appellant's brief pertaining to human sexuality, sexual development and orientation, coitus, heterosexual behavior, and emerging trends in sexuality. Thousands of words. Hours of reading. Graphs. A plethora of charts. In short, I note a preoccupation of the brief writer with the general subject of sex, apparently to educate the members of this Court with all manner of human sexuality so that (apparently) they would judge this case from a more enlightened view.* Further noted is an infusion by said brief writer of psychological opinions and social opinions on general behavior of adults and page after page of private opinion on various conduct and how it affects children and multiple relationships of people. Reflected further are personal opinions of the brief writer cascading on, like a waterfall, page after page, spilling out the brief writer's private opinions on love and affection and the relative merits of the ex-wife's conduct in her relationships. However, there is a startling lack of authorities to back up these private opinions, although the brief writer does cite some of the important South Dakota Supreme Court decisions involving domestic relations generally. Interspersed with private opinions and philosophy, the brief writer exhorts this Court to establish guidelines for the trial court in the future about "determining the facts of this case, and in applying the same to the laws of the state of South Dakota." The same brief writer advises us to instruct the trial court on other matters concerning conduct of the parties and to remind the trial court of its duties as well as the previous important decisions of this Court.

All in all, appellant's brief is quite unusual and spiced with irrelevancies, quite unlike any brief these eyes have ever beheld. Another example: Adolescents having intercourse experience, 1650 to 1900, 1900 to 1940, 1940 to 1970's. One senses that the spirit of the brief is to teach this Court about the "birds and the bees" from 1650 through 1988 that we might better adjudicate upon the appeal before us. Attached to appellant's brief are Appendices A, B, and C. These are not a part of the settled record. Appendix A, a treatise on human sexuality, expresses: "1650 to 1900 It is clear that intercourse before marriage is not an invention of the twentieth century." Of course, I recognize this as a startling revelation in the history of American society, not to mention mankind generally.

Lo, these many years, I have written on the subject of alimony, believing need and the ability to pay were critical considerations. My views on child support, both as a

---

* It escapes me how the article, ADOLESCENT INTERCOURSE: JAPAN, ISRAEL, COLOMBIA, covered in extenso in the briefs, is relevant to our inquiry. Another article is captioned, BLACK MALES AND LOVE (but the people involved in this case are Caucasian). Charts on sexual behavior of college students are included (but litigants are not college students).

former trial judge and later an appellate Justice, paralleled my basic alimony belief: The needs of the children must be considered as well as the ability to pay for those needs. Here, Father had the ability to pay, but refused to pay child support. In October 1984, he was $2,800 in arrears in child support payments. He would not pay same. The trial court, in its equitable power, ordered him to pay $175 to the Brown County Clerk of Courts, $150 of which was to be regular child support, and $25 to apply toward the arrearages. Compulsion of the court order meant nothing to him, for he made only three payments on the 1984 balance. In 1985, he made no payments for nine out of twelve months. Were it not for this Mother, the children, his own flesh and blood, would have literally starved to death. This type of non-support is grievous conduct against these children and against humanity. He lived in comfort, making payments on a very nice home, while his children suffered. Now, he wants to place these children in this very nice home and contend that he is really quite a nice fellow. The trial court found that Father's failure to pay regular child support contributed to Mother's difficulties. Father extols his stable lifestyle and his present ability to provide a home for the children. This author concludes that the majority opinion is extremely harsh to this Mother under all of the circumstances. Apparently, the trial court could not find that the Mother's sexual activity had a harmful effect upon the children. Apparently, the trial court was versed in *Kester v. Kester*, 257 N.W.2d 731, 734 (S.D.1977).

The majority relies on *Kolb v. Kolb* and *Hansen v. Hansen* for the proposition that no substantial change of circumstances need be shown. I disagree for those reasons set forth in my writings below, two of which were majority opinions:

> Therefore, this case should be reviewed under the two-prong test set forth in three recent cases including *Engels v. Engels* which holds:
>> [T]he parent seeking modification of custodial rights has the burden of proving by a preponderance of the evidence that (1) there has been a sub-

stantial and material change of circumstances since the decree of divorce was entered, and (2) the welfare and best interests of the children require the modification being sought.

*Hansen v. Hansen*, 327 N.W.2d 47, 50 (S.D. 1982) (Henderson, J., concurring in result) (quoting *Engels v. Engels*, 297 N.W.2d 489, 491 (S.D.1980)). *See also Sneesby v. Davis*, 308 N.W.2d 565 (S.D.1981); *Menning v. Menning*, 272 N.W.2d 828 (S.D. 1978).

Father's attack in this case was on the Mother's sex life. His defense, for the neglect of these children by him, was an offense about Mother's boyfriends and what bad company they were for her. This same attack is highlighted again and again, in the briefs. The trial judge concluded that he believed both parents acted immorally, and he stated he saw no reason to change custody. Additionally, the trial judge prepared his own findings of fact and conclusions of law. It would not appear that this was necessary under our previous rulings, *see Millea v. Millea*, 89 S.D. 112, 229 N.W.2d 95 (1975). We have apparently held in the past that an order modifying child custody need not be buttressed by findings of fact. If an order to show cause is issued for modification of custody, an order is entered, as distinguished from a judgment. Justice Wollman, in a dissent in the oft-cited case of *Masek v. Masek*, 90 S.D. 1, 7, 237 N.W.2d 432, 435 n. 1 (1976), reflected that it would be wise, perhaps, to have this Court reexamine our rule concerning findings of fact not being necessary to support an order which evolves from a child custody modification of a divorce decree; this Court did not follow-up on such a suggestion and this Court should seriously reconsider Justice Wollman's dissent. Under all of the circumstances of this case, I do agree with the majority writer that it would be excellent to have home studies and impartial witnesses testify to reach the "best interests of the child" platform of proof.