**Michael James CHICOINE, Plaintiff and Appellant,**

v.

**Lisa Kay CHICOINE, Defendant and Appellee.**

No. 17364.

Supreme Court of South Dakota.

Argued Sept. 11, 1991.

Decided Jan. 8, 1992.

supervised, overnight visitation to lesbian mother. We affirm in part, reverse in part, and remand.

## FACTS

Michael and Lisa Chicoine were married on March 5, 1983, in Jefferson, South Dakota. The couple had two children, James, who was born on January 30, 1986, and Tyler, who was born October 23, 1987. Sometime during her pregnancy with Tyler, Lisa began the first of a series of admitted lesbian affairs which put a great strain on Chicoines' marriage. This was an open and notorious affair, and Lisa's lover even demanded that she be present for Tyler's delivery.

In February, 1989, Lisa and her lover broke up; thereafter, Lisa entered a treatment program for anorexia nervosa. After Lisa left treatment, she returned to the marital home and openly began a series of homosexual affairs.

In August of 1989, Lisa and the children moved out of the Chicoines' home and into the home of one of her lovers. During this time, Lisa and her lover made plans for Lisa to divorce Michael and obtain custody of the children for them to raise after she and her lesbian lover were "married." Shortly thereafter, Michael obtained a temporary custody order and brought the children home.

In late August, 1989, Michael filed for divorce on the grounds of extreme cruelty. After a trial on the merits, the court granted Michael a divorce and awarded him custody of the children. Lisa, who was undergoing treatment for various psychological problems, did not contest the custody award.

On the issue of visitation, the trial court found that while "Lisa had been less than discrete about her sexual preference" in the past and while she admitted her behavior in front of the children was inappropriate, it was in the children's best interest for Lisa to have restricted visitation rights. Lisa was awarded visitation every other weekend from 7:00 p.m. on Friday to 7:00 p.m. on Sunday; three weeks in the sum-

Ronald W. Banks of Banks, Johnson, Johnson, Colbath & Huffman, on the brief, John J. Delaney of Banks, Johnson, Johnson, Colbath & Huffman, Rapid City, for plaintiff and appellant.

Lee R. Burd, Sioux Falls, for defendant and appellee.

MILLER, Chief Justice.

Father appeals from an order of the circuit court, which divided the property of the parties and awarded restricted, but un-

mer; and, alternating holidays as follows: New Years Day, Easter, Memorial Day, 4th of July, Labor Day, Veteran's Day, Thanksgiving Day, Christmas Eve; and Mother's Day. *The only restrictions were that no unrelated female or homosexual male could be present during the children's visits.*

The trial court also divided Chicoines' property. Michael received all of the farmland and all of the farm machinery, livestock and crops. Lisa received a car, cash she had already withdrawn ($19,000), and a cash award of $41,912.

## DECISION

### I

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING UNSUPERVISED OVERNIGHT VISITATION.

■ Michael argues the trial court abused its discretion in allowing unsupervised overnight visitations to Lisa. The trial court has broad discretion in awarding custody of minor children and likewise visitation rights; therefore, the trial court's decision can only be reversed upon a clear showing of an abuse of that discretion. *Madsen v. Madsen,* 456 N.W.2d 551, 553 (S.D.1990); *Jones v. Jones,* 423 N.W.2d 517, 519 (S.D.1988); *Lindley v. Lindley,* 401 N.W.2d 732, 735 (S.D.1987); *Saint–Pierre v. Saint–Pierre,* 357 N.W.2d 250, 254 (S.D.1984).

In cases such as this, the court's primary consideration is the best interests of the children. SDCL 30–27–19. Michael contends the children's development will be harmed by the continued exposure to Lisa's homosexual lifestyle; therefore, it is not in their "best interests" to have unsupervised overnight visits with their mother.

■ The trial court must determine from all the facts and circumstances what is in the best interests of the child "relative to the child's temporal, mental and moral welfare." *Lindley,* 401 N.W.2d at 735; SDCL 30–27–19. In most circumstances, "it will be in the best interests of children

that they receive the love, affection, training, and companionship of their noncustodial parent." *Roberts v. Roberts,* 22 Ohio App.3d 127, 128, 489 N.E.2d 1067, 1069 (1985). This is not true, however, "where the evidence establishes that exercise of visitation will be harmful to the welfare of the children; in this event, the right of the noncustodial parent to visit with his children can be limited, or, under extreme circumstances, prohibited altogether." *Id.*

This court, in *Rivers v. Rivers,* 322 N.W.2d 864 (S.D.1982), denied the father overnight visitation because he was living with a woman to whom he was not married. We recognized that, as in child custody cases, the "harmful effect of parental misconduct committed in the presence of a child old enough to see and recognize it is self-evident." *Id.* at 865.

In *Kallas v. Kallas,* 614 P.2d 641 (Utah 1980), the Utah Supreme Court addressed the issue of a parent's right to visitation. "Although a parent's sexuality in and of itself is not alone a sufficient basis upon which to deny completely a parent's fundamental right, the manifestation of one's sexuality and resulting behavior patterns are relevant to custody and to *the nature and scope of visitation.*" *Id.* at 645 (emphasis added); *see also MJP v. JGP,* 640 P.2d 966, 968 (Okl.1982).

■ The record in this case reveals:

(1) Lisa has experienced a myriad of psychological problems including an eating disorder, depression, suicidal threats, sexual abuse as a child and active homosexual relationships with several female partners.

(2) In the last two years of the marriage, Lisa was absent from the home frequently.

(3) Lisa openly admits that she is an active homosexual and that she had many sexual encounters with female partners *during* the marriage to Michael.

(4) Lisa and the children moved out of the marital home and into Lisa's lover's home.

(5) Lisa and her lover were affectionate toward each other in front of the chil-

dren, caressing, kissing and saying "I love you."

(6) The oldest son reacted by saying "Mommy don't touch," or "Don't!" when Lisa and her lover held hands.

(7) Lisa and her lover were in an intimate position in bed when the oldest son entered the room. Lisa told her son to go back to bed and when questioned by her son as to why she was lying on top of the other woman, Lisa told him she was telling secrets. Lisa did not stop the sexual act to comfort her son.

(8) On at least two occasions, Lisa took the children to gay bars in Sioux City when she was out looking for her lover.

(9) On some occasions when the children were not present, Lisa publicly danced with females, kissing and caressing them on the dance floor.

(10) On some occasions, James and Tyler were allowed to get in bed to sleep with Lisa and her lover. Sometimes, Lisa would be unclothed.

(11) Lisa and her lover discussed getting married and raising the children in a homosexual marriage.

(12) Lisa admits that it is inappropriate to hold hands, kiss and show affection to her lesbian partners in front of her children.

(13) Lisa has openly exposed her homosexual feelings in front of her sons on more than one occasion.

(14) Dr. Arbis testified that "unless Lisa blatantly and consciously encourages them [the children] to engage in sexual behavior, or *blatantly exhibits her sexual behavior in front of them,* they will not receive any adverse developmental messages in terms of their own sexual preferences.

Although the trial court tried to protect the children through the visitation restrictions, "we are troubled by the order's incomplete response to the uncontroverted evidence concerning the harm threatened to the children" by its granting extensive, unsupervised, overnight visitation. *Roberts,* 489 N.E.2d at 1069. The trial court

has a duty to ensure the children are protected at every turn. *Williams v. Williams,* 425 N.W.2d 390, 393 (S.D.1988); *Jasper v. Jasper,* 351 N.W.2d 114, 117 (S.D. 1984). As we said in *Williams,* "at the very least, trial courts have the authority, and at times the obligation, to require a homestudy ... so it can be assured that the children are not placed, or do not remain, in surroundings seriously detrimental to their well-being." 425 N.W.2d at 393.

[T]his is one of those situations where the trial court had the obligation to do more. Judges in these cases have the awesome responsibility to protect children and '[t]he parents' personal wishes and desires must yield to what the court in the discharge of its duty regards as the children's best interest.'

*Shoop v. Shoop,* 460 N.W.2d 721, 727 (S.D. 1990) (Miller, C.J., dissenting) (citing *Jasper,* 351 N.W.2d at 117; *Williams,* 425 N.W.2d at 393).

Lisa and her psychologist have indicated that they believe she is now prepared and capable of providing a suitable environment for the children. At this juncture, this conclusion appears to us to be both speculative and premature. We are not reassured, given Lisa's past actions, that she will put the needs of her children first.

The trial court must have shared these doubts, since it placed restrictions on the visitation rights. However, these restrictions, especially considering the liberal visitation rights granted, are difficult, if not impossible, to enforce. Before granting such liberal visitation rights, the trial court must avail itself of other means, including a home study, to be assured that the children are not placed in an unsafe or unstable environment. Similarly, the trial court must provide adequate enforcement measures to assure compliance with any restrictions imposed should it persist in granting overnight visitation.

We reverse and remand with the direction that the trial court reconsider this issue in light of this holding.

## II

### WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DIVIDING THE PROPERTY.

■ It is well settled that the trial court has broad discretion with respect to property division and, absent an abuse of discretion, its judgment will not be set aside. *Caughron v. Caughron*, 418 N.W.2d 791, 792 (S.D.1988); *Tate v. Tate*, 394 N.W.2d 309, 311 (S.D.1986). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Paradeis v. Paradeis*, 461 N.W.2d 135, 137 (S.D.1990) (citing *Bradeen v. Bradeen*, 430 N.W.2d 87, 91 (S.D.1988)). Trial courts have full power to make an equitable division of the property belonging to the parties to a divorce action and, in making such division of property, it shall have regard for equity and the circumstances of the parties. *Saint–Pierre*, 357 N.W.2d at 257; SDCL 25-4-44.

■ The factors to be considered in dividing marital property are the (1) duration of the marriage, (2) value of the property owned by the parties, (3) ages of the parties, (4) health of the parties, (5) competency of the parties to earn a living, (6) the contribution of each party to the accumulation of property, and (7) the income-producing capacity of the property owned by the parties. *Johnson v. Johnson* 471 N.W.2d 156, 159 (S.D.1991); *Ryken v. Ryken*, 461 N.W.2d 122, 123 (S.D.1990); *Saint–Pierre*, 357 N.W.2d at 258. The trial court considered and entered findings consistent with the foregoing.

In making a division of property in a divorce action, the trial court is bound by no mathematical formula. *Johnson*, 471 N.W.2d at 160; *Baltzer v. Baltzer*, 422 N.W.2d 584, 587 (S.D.1988); *Booth v. Booth*, 354 N.W.2d 924, 926 (S.D.1984); *Owen v. Owen*, 351 N.W.2d 139, 141 (S.D. 1984).

■ The value of the real estate was $211,333 and the value of the personal property was $99,224. The liabilities on the real and personal property were $122,-100. Thus, the value of the gross marital estate was $310,557 and its net value was $188,457. The trial court awarded Lisa a net amount[1] of $60,820, approximately thirty-two percent of the net estate.[2]

The trial court entered specific findings with respect to each of the seven factors set forth above. "In view of the fact that there is an adequate basis in the record to support each of the trial court's findings regarding the division of property, and because it quite clearly appears that the trial court took into account all of the pertinent factors in making that division, we cannot say the trial court abused its discretion in dividing the property." *Booth*, 354 N.W.2d at 927.

Affirmed in part, reversed in part, and remanded to the circuit court for further proceedings consistent herewith.

AMUNDSON, J., concurs.

WUEST and SABERS, JJ., concur in part and dissent in part.

HENDERSON, J., concurs specially in part and dissents in part.

WUEST, Justice (concurring in part and dissenting in part).

I would affirm the trial court on all issues. The trial court did not clearly abuse its discretion in providing visitation to the mother. He did order no unrelated female could be present during visitation. Any violation of this order would be promptly discovered and the court could take appropriate action.

I do not have any problem with a home study in the proper case, but what would a home study accomplish in this case? The trial court already knew about her past homosexual activities.

It seems to me the trial court did its best in making a difficult decision. Perhaps I

---

1. Lisa is responsible for debt on auto and debt to St. Luke's Hospital.

2. The trial court further ordered Lisa to pay Michael child support of $147.84 per month and denied her request for alimony.

would have done differently, but that is not the test. We should not be fine tuning divorce cases by substituting our judgment for that of the trial court. The trial court having observed the parties, and having heard the evidence, is in a better position to decide these issues.

SABERS, Justice (concurring in part and dissenting in part).

I join Justice Wuest's dissent for the reasons stated therein and for the reasons stated in my dissent in *Parsons v. Parsons*, 469 N.W.2d 581, 585 (S.D.1991), which dissent was joined by Justice Wuest. Although *Parsons* dealt with "distribution of assets and obligations" as opposed to visitation rights, the statement therein applies here with equal force: "The majority opinion unduly tinkers with a well-reasoned memorandum opinion and findings and conclusions...." *Id.*

HENDERSON, Justice (specially concurring in part; dissenting in part).

I join the writing of the Chief Justice concerning the reversal of the trial court on the liberal grant of visitation unto the lesbian mother. For years, she has followed a life of perversion and openly flaunted it before these children. At the hour of judicial atonement, she now pretends to have changed. This present facade is of transitory mood and a cunning plan, by employing a psychologist, to wrest away good judgment from the judicial officers hereunto attending this case.

Lesbian mother has harmed these children forever. To give her rights of reasonable visitation so that she can teach them to be homosexuals, would be the zenith of poor judgment for the judiciary of this state. Until such time that she can establish, after years of therapy and demonstrated conduct, that she is no longer a lesbian living a life of abomination (*see*

Leviticus 18:22), she should be totally estopped from contaminating these children.[1] After years of treatment, she could then petition for rights of visitation. My point is: she is not fit for visitation at this time. Her conduct is presently harmful to these children. Thus, she should have no visitation. *L. v. D.*, 630 S.W.2d 240 (Mo.App. 1982). *See, also, S.E.G. v. R.A.G.*, 735 S.W.2d 164 (Mo.Ct.App.1987). Therein, the court ordered restricted visitation. Said case supports the Chief Justice of this state. In *Kallas v. Kallas*, 614 P.2d 641 (Utah 1980), the court approved of restrictions to prevent harmful effects upon children. Some courts have taken a position, under "sodomy statutes" that a homosexual partner (parent) is a criminal and therefore not a fit parent. *See*, 102 Harvard L.Rev. 620–621 (January 1989). Note SDCL 22–22–2 setting forth acts constituting sodomy in this state. SDCL 22–22–1 defines rape as a felony. It appears that homosexuals, such as Lisa Chicoine, are committing felonies, by their acts against nature and God. Actus naturae, actus Deus. This is an old Latin phrase, which became a legal maxim.[2] Literally, it means an act against nature is an act against God. As of four years ago, twenty-four states and the District of Columbia imposed criminal sanctions on consenting adults who engage in private homosexual intercourse. *See*, Note, *Constitutional Challenges To Sodomy Statutes In the Context of Homosexual Activity After Bowers v. Hardwick*, S.D.L.Rev. 323 (1987). In the case of *In re B.*, 85 Misc.2d 515, 380 N.Y.S.2d 848 (1976), mother lost custody to father, after she admitted to being a homosexual. In said case, various experts testified to the emotional problems suffered by children being exposed to such a lifestyle. In the case before this Court, the record reflects, by expert testimony, that there existed harmful effects to these children by their contin-

---

1. Every judicial decision of consequence, in my opinion, reflects a moral judgment.

2. For those who advocate that exercising a moral judgment is a violation of separation of "church and state," may I express: Those advocates would turn the First Amendment on its

head proposing, in effect, that any belief can be fully exercised except religious belief. Judges have values, or should have. We need not be value-neutral. Why must I, or any judge, *e.g.*, follow Freud or Marx?

ued exposure to Lisa Chicoine's homosexual behavior and lifestyle.

There appears to be a transitory phenomenon on the American scene that homosexuality is okay. Not so. The Bible decries it. Even the pagan "Egyptian Book of the Dead" bespoke against it. E.A. Wallis Budge (trans.), New Hyde Park, N.Y.: University Books, 1968, p. 578. Kings could not become heavenly beings if they had lain with men. In other words, even the pagans, centuries ago, before the birth of Jesus Christ, looked upon it as total defilement.[3] This case is in a divorce setting. If it were under the juvenile code of this state, rights to a child could be *totally terminated*, through a petition, by reason of "environment ... injurious to the child's welfare" imposed by parents upon a child. SDCL 26–8A–2(3); SDCL 26–8A–26. If petition is sustained, after a dispositional hearing, rights may be terminated by the court. SDCL 26–8A–27.

In *J.L.P.(H.) v. D.J.P.*, 643 S.W.2d 865 (Mo.Ct.App.1982) that court held that the trial court did not err in restricting visitation of a homosexual father. At page 870 thereof, it quotes a New York Supreme Court case and a New Jersey Superior Court case, both jurisdictions severely curtailing visitation rights. *In re Jane B.*, 85 Misc.2d 515, 380 N.Y.S.2d 848 (1976); *In re J.S. & C.*, 129 N.J.Super. 486, 324 A.2d 90 (1974), *aff'd per curiam*, 142 N.J.Super. 499, 362 A.2d 54 (1976).

Here, Lisa Chicoine's conduct is so aggravated and her mental dementia is so apparent, that until she has years of treatment, she should not have any visitation at all. She can order to show cause to have visitation when it is established she will not harm these children further.

On issue two, I dissent. In my opinion, the trial court's division of property was an abuse of discretion. It was not soundly and substantially based upon the evidence.

*Goehry v. Goehry*, 354 N.W.2d 192 (S.D. 1984).

Lisa received an award of approximately 46% of all property acquired *after* the marriage. This marriage lasted seven years but she abandoned the marriage several years before to engage in a series of affairs with homosexual "lovers." She bought a diamond ring costing $1,000.00 for a recent female "lover" from the fruits of this young farmer's labor. Raising crops by the sweat of your brow, and an investment in machinery, is to advance the family, not to serve abominable conduct. Her contribution to the accumulation of assets was extremely limited.

When Lisa was deep into her homosexuality conduct—leaving the home—not attending the children—spending money in bars and on gifts to a "lover," the husband inherited property. Trial court included inherited property in its award to Lisa. Her hands are unclean; she is not in the court system with clean hands. *Peterson v. Peterson*, 449 N.W.2d 835 (S.D.1989) (Henderson, J., concurring in part, dissenting in part); *Kane v. Schnitzler*, 376 N.W.2d 337 (S.D.1985); *Stach v. Stach*, 369 N.W.2d 132 (S.D.1985); *Valley Bank v. Dowdy*, 337 N.W.2d 164 (S.D.1983). She does not deserve this kind of "equity." It is inequitable for her to receive a part of his inheritance. Further, Lisa came into the marriage with her clothes and an old indebted automobile, whereas Michael Chicoine owned substantial property, crops, livestock and cash. He was then a successful farmer. Trial court failed to take into consideration the parties' contribution to the accumulation of the property. In fairness to Lisa, she did contribute as a homemaker for a little under three years. Evidence reflects that her contributions to farm labor were minimal, at best. Her domestic services requires that she be awarded some property and cash. Inter alia, Lisa was "awarded" $19,000 in cash which she secretly took at separation.

---

3. Article VI of the United States Constitution provides that, inter alia, "no religious test shall ever be required as a qualification to any office or public trust of the United States." Notice the word "ever." Too many constitutional scholars engage in careless theory concerning church-state conflict; this thought process, often, is an effort to impose a religious gag upon judges of our country.

Such unmitigated gall in taking the fruits of this young farmer's labor should be punished, not rewarded. The trial court, additionally, awarded her $41,912.00 in cash. This compounded and perpetuated an existing wrong for it rewards a rejection of the good things in the sacrament of marriage. I would pray that God help the decent hardworking young farmers and ranchers of this state. They have a tough road to hoe and they are rapidly becoming extinct. They are the vanishing Americans of this era, not the Mohicans. May the fires of matrimonial hell prevail against them not. In the property award, she has received far more than she deserved considering her minimal contributions to the marriage (indeed, she destroyed it) and her slight efforts to the accumulation of marital property. I would reverse the trial court on the property distribution; it is unfair and an abuse of discretion. *Temple v. Temple*, 365 N.W.2d 561 (S.D.1985). Under the rationale of the trial court, this cash award is in lieu of an award of real property. The real property was acquired after she, de facto, quit the marriage, to "lay with a woman." So she had no *equitable rights* to real property, accumulated by her husband, without one whit of effort on her part.

## CAVEAT

A caption in an article from the Arizona Republic dated December 27, 1991, taken from the San Francisco Examiner: *Radical Gay Group Dead After Infighting.* Extracted portions are quoted: "The radical gay group Queer Nation is dead—a victim of its success in offending not only mainstream culture but its own membership as well." "It was an incredible free-for-all" at the end, member Alan Carson said. "People, mostly women, began to feel alienated," he said. "Some people were grabbing all the opportunities and the spotlight, drowning out a more diverse array of voices." "Disputes reportedly were resolved through screaming matches."

There is hope for our Nation. We have witnessed an upheaval in the churches over sexual ethics. This was recently epitomized in the Presbyterian Church (USA) which, essentially, knocked down efforts to condone sex relations of homosexuals.