Bonnie **BENNETT**, Plaintiff and Appellant,

v.

Robert **BENNETT**, Defendant and Appellee.

Nos. 18426, 18439.

Supreme Court of South Dakota.

Considered on Briefs March 22, 1994.

Decided May 25, 1994.

Rick Johnson, Stephanie Pochop, Johnson, Eklund, Nicholson, Dougherty · & Abourezk, Gregory, for plaintiff and appellant.

Tom D. Tobin, Kenn A. Pugh, Tobin Law Office, Winner, for defendant and appellee.

WUEST, Justice.

This is an appeal from the provisions of a decree of divorce to Robert Bennett (Robert) and Bonnie Bennett (Bonnie) dividing the property of the parties. We affirm in part, reverse in part, and remand.

### FACTS

Robert and Bonnie were married on August 12, 1967. Robert was age 37, and Bonnie was age 30 at the time of the marriage. Both are presently in fair health. At the time of the marriage, Bonnie had two daughters of a previous marriage, aged 7 and 8. No children were born of the marriage between Robert and Bonnie.

Property brought into the marriage by Bonnie included some horses, sheep, and a car, valued at approximately $5,000. Robert had started a ranching operation, and although he owned no land at the time of the marriage, Robert did have some livestock (300 cattle) and farm equipment. A 1967 financial statement shows that Robert had a total net worth of $54,259 at the time of the marriage.

During the course of the marriage, the parties worked to increase the value of the ranching operation. They started buying land in 1970, and at the time of the divorce in 1993 owned 3,942 acres of land valued at approximately $490,000. The ranching operation was further developed with the addition of buildings, building improvements and machinery acquisitions. It was undisputed that, in addition to maintaining the household, Bonnie and her daughters were an integral part of the ranching operation. Bonnie performed an entire range of ranching chores such as operation of farm equipment in the crop operation; constructing and repairing fence, lambing and calving, milking cows, and assisting with sorting, branding and vaccination of cattle.

Although they apparently had been experiencing difficulties prior to the Fall of 1988, it was at that time that the parties separated. One of Bonnie's daughters had broken her leg in an accident, and Bonnie went to assist her. During that time, Robert took Bonnie's name off their joint checking account, and told Bonnie to get her horses off his land. Bonnie delayed filing for a divorce at Robert's request, as he was having health problems. The divorce action was commenced in February 1991. Robert then decided to have surgery, so proceedings were further delayed. In September 1991, the parties met to negotiate a property settlement. Robert asked to be left alone for a year or two, and said that he would then agree to an equitable property settlement. At the time of trial in February 1993, Robert expressed his feeling

that Bonnie had "not really" left him alone long enough.

The trial court issued an Amended Decree of Divorce on July 20, 1993. In this appeal, Bonnie raises a number of issues regarding the property award, and Robert raises one issue in his notice of review. We address these issues, noting additional facts where necessary.

### STANDARD OF REVIEW

■ The standard of review for property divisions was recently reiterated by this court:

It is well settled that the trial court has broad discretion with respect to property division and, absent an abuse of discretion, its judgment will not be set aside. *Caughron v. Caughron,* 418 N.W.2d 791, 792 (S.D.1988); *Tate v. Tate,* 394 N.W.2d 309, 311 (S.D.1986). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Paradeis v. Paradeis,* 461 N.W.2d 135, 137 (S.D.1990) (citing *Bradeen v. Bradeen,* 430 N.W.2d 87, 91 (S.D.1988)).

*Chicoine v. Chicoine,* 479 N.W.2d 891, 895 (S.D.1992). A limit on the trial court's discretion in dividing the property of the parties is SDCL 25–4–44.[1] *See Johnson v. Johnson,* 471 N.W.2d 156, 159 (S.D.1991). Factors to be considered in making a property division include: (1) The duration of the marriage; (2) the value of the property owned by the parties; (3) ages of the parties; (4) health of the parties; (5) competency of the parties to earn a living; (6) the contribution of each party to the accumulation of property; and (7) the income-producing capacity of the property owned by the parties. *Chicoine,* 479 N.W.2d at 895 (citing *Johnson,* 471 N.W.2d at 159; *Ryken v. Ryken,* 461 N.W.2d 122, 123 (S.D.1990); *Saint–Pierre v. Saint–Pierre,* 357 N.W.2d 250, 258 (S.D.1984)).

ISSUE I: *Did the court err when, prior to calculating the property division, it credited Robert with 300 cattle as pre-marital property, valuing those cattle at 1993 prices, rather than a 1967 valuation?*

■ In its calculation of the marital property, the court deducted the $5,000 worth of property that Bonnie brought into the marriage in 1967. On Robert's side, the court deducted $262,500. The court explained this figure by noting that Robert brought 300 head of cattle "free and clear" into the marriage, and that those cattle had a "current [1993] value of $262,500." The court further noted that it intended to distribute 300 cows at their 1993 value ($875 per cow) to Robert, and not include them as marital property. This calculation by the trial court was an abuse of discretion. *Chicoine,* 479 N.W.2d at 895.

First, the 1967 financial statement shows that the cattle were not owned "free and clear." Robert carried considerable debt against both livestock and equipment; his net worth was $54,259. The financial statement also shows that the 1967 cattle were valued at $200 per head (with the exception of forty summer calves valued at $107.50 per head). It is undisputed the cattle owned in 1993 were not the same type or grade of cattle as those owned in 1967; the 1993 cattle were a reputation, fancy grade of cattle. The parties worked over the years to maintain and improve the cattle herd. The cattle appreciated significantly in value. Both parties should share in this appreciated value.

■ We have previously addressed situations similar to those presented here. *See Prentice v. Prentice,* 322 N.W.2d 880 (S.D. 1982); *Temple v. Temple,* 365 N.W.2d 561 (S.D.1985). In *Temple,* we explained and applied the concepts found in *Prentice:*

In *Prentice,* [322 N.W.2d at 882–83] this court held that the trial court abused its discretion when it failed to divide farm property as part of the marital estate. The husband in *Prentice* took over a farm upon which his father had paid half of the purchase price. The parties to the divorce

---

1. SDCL 25–4–44 provides:

When a divorce is granted, the courts may make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife. In making such division of the property, the court shall have regard for equity and the circumstances of the parties.

paid off the balance due on the farm from farm proceeds and this court held that the husband's interest in the farm should be divided between them as part of the marital estate. The *Prentice* Court found that the wife helped pay off the balance due on the farm, that together they improved the residence, and that both parties worked to increase the size and value of the farm; consequently, the wife was entitled to a share of her husband's interest in the farm operation.

*Temple*, 365 N.W.2d at 567. Due to the "expansion and increased value of the ranch" in *Temple*, we followed *Prentice* in holding that the wife was entitled to a share of the interest in the ranch. *Id.* Likewise, the maintenance and improvement of Robert and Bonnie's cattle herd was due to the joint efforts and labors of both parties. Bonnie is entitled to share in that increased value, and we reverse the trial court's decision on this issue. We will not bind a trial court to a strict mathematical formula when reviewing marital property divisions. *Korzan v. Korzan*, 488 N.W.2d 689, 693 (S.D.1992) (citing *Martin v. Martin*, 358 N.W.2d 793, 797 (S.D. 1984)). However, the trial court may not exclude one party from sharing in the value of labors that resulted in appreciated value to property during the course of a lengthy marriage. On remand, the trial court may properly deduct from the marital estate the 1967 values of the properties brought into the marriage by *both* parties; i.e., Bonnie's $5,000 worth of property, and Robert's 1967 net worth of $54,259.

**ISSUE 2:** *Did the court err when it failed to consider the 1993 calf crop in the value of the marital estate?*

■ Attached to Bonnie's proposed findings of fact and conclusions of law was a proposed schedule for calculation of the property division. The schedule showed the cows valued at $875 per head, and additionally showed the expected 1993 calf crop of 400 calves valued at $200 per head for a total $80,000 value on the 1993 calf crop. The trial court adopted the $875 per head value on the cows, but stated that, "The court is not going to consider the 1993 calf crop. The

cows were appraised as bred cows. A further hearing on valuation of the property will not be held."

The record reveals that shortly before trial, the Production Credit Association (PCA) completed an appraisal of the livestock. Before trial, counsel agreed to admission of various written appraisals into evidence, noting that even "if the witnesses were here to testify, they would testify substantially as shown by those exhibits." Thus, the individual who prepared the PCA appraisal was not called as a witness. The PCA livestock appraisal shows that the cows were estimated at 1100 pounds in weight and valued at $900 per head, but does not show whether the cows were appraised as bred cows. There was no stated value for the expected calf crop.

It was undisputed at trial that the Bennett's cattle were a reputation, fancy grade of cattle. When Robert was asked whether the cows were worth $900 a head, he replied, "I don't know if they are or not." Robert also stated that bred cows had been "bringing less" than $900 a head, at "any sale barn you want to go to," but offered no evidence to substantiate that. Later, however, Robert testified that some springing heifers[2] had sold "the other day for $1530, for 20 head." Robert was also asked, "What are those calves worth when they hit the ground right now?" · He replied, "Probably three hundred [$300], at Gregory Auction."

Bonnie likewise testified to recent cattle sale prices at area livestock auctions. Admitted into evidence were sale results from area newspapers. Bonnie pointed out two January 27, 1993 sales of bred heifers at a "special bred cow" sale at the Presho Livestock Auction—one set of 27 bred heifers weighing 1101 pounds sold for $1530 a head; another set of 26 bred heifers weighing 1050 pounds sold for $1320 a head. Of the representative sales of the bred cattle at the Presho bred cow sale, very few were below $875; most appeared to be well above that price.

The record does not reveal whether the PCA appraiser valued the cows as bred cows

2. Springing heifers are heifers that are close to    calving.

or not. Bonnie contends that the cows and the calf crop should be valued separately, and requested that the court hold a valuation hearing to place a value on the calves born in March through May 1993. Robert simply states that the court correctly excluded the calf crop from the valuation of the parties' property, and further argues—without support or citation to any authority—that the "date and manner of appraisal of cattle is standard throughout the state of South Dakota."

Although we will not attempt to place a valuation on any of the parties' assets, a "trial court must place a value upon all of the property held by the parties and make an equitable distribution of that property." *Guindon v. Guindon,* 256 N.W.2d 894, 897 (S.D.1977). Further, we have stated:

> On review of a property division, this court will not attempt to place valuations on the assets because that is a task for the trial court as the trier of fact. The only time this court interferes with the valuations determined by the trial court is when it has made a clearly erroneous valuation finding.... [I]n valuing marital property, a trial court is not bound by the valuations set forth by the parties. The trial court need only set the values at a figure that lies within a reasonable range of figures, and it need not be an exact amount.

*Schumaker v. Schumaker,* 439 N.W.2d 815, 816 (S.D.1989) (citing *Herrboldt v. Herrboldt,* 303 N.W.2d 571, 572 (S.D.1981)). *See Baltzer v. Baltzer,* 422 N.W.2d 584, 586 (S.D. 1988) (stating that " 'Exactitude is not required of the trial court in the valuation of assets in a dissolution proceeding; it is only necessary that the value arrived at lies within a reasonable range of figures.' ") (citations omitted); *Pennock v. Pennock,* 356 N.W.2d 913, 914 (S.D.1984) (holding that this court cannot place a valuation on assets because that is a fact finding function of the trial court; valuations need only be in the range of evidence before the trial court).

Prior to trial, Bonnie knew the PCA had placed a value of $900 per head on the cattle. If Bonnie wanted to dispute that valuation, she should have been "prepared to produce hard evidence" as to the value of the livestock. *Hanks v. Hanks,* 296 N.W.2d 523, 526 (S.D.1980). At trial, Bonnie could have called the PCA appraiser to examine him as to the method of valuation, and to challenge those values. She could have called her own expert witness to testify on valuation of the livestock. Bonnie could have offered her own "hard evidence" as to valuation of the cattle as bred cattle, or as cows and calf crop. It does appear, from our review of the record, that the court's choice of $875 per head as the value of reputation, fancy grade bred cattle that were ready to calve was at the low end of the range of evidence before the trial court. However, we cannot say that the court's determination was clearly erroneous, and affirm the circuit court on this issue.

**ISSUE 3:** *Did the long-term method of payment of Bonnie's share of the property award yield an inequitable result to Bonnie?*

In its findings of fact, the court stated that, "The continued viability of Robert's ranching operation requires that he be given the choice of either paying off the property division in one lump sum or over ten years at 5% interest." Bonnie disputes this finding by the trial court, stating that this deferred payment of the property division is "neither fair nor equitable." Bonnie's own proposed findings of fact included a proposal that the balance of the sum owed to Bonnie be satisfied by Robert "either giving cash, livestock, or other property to [Bonnie], but that [Robert] may elect to pay [the balance] over a 10–year period at 5% interest."

We agree that there was no evidence on the record that the "continued viability" of the ranching operation *required* a deferred payment schedule for the property award. Further, we have stated that, "in dividing marital property, an equitable division is paramount to one party's interest in keeping the ranch intact." *O'Connell v. O'Connell,* 340 N.W.2d 700, 702 (S.D.1983) (citing *Hanson v. Hanson,* 252 N.W.2d 907, 909 (S.D.1977)). However, in this case, *Bonnie offered deferred payment as one method to satisfy the property award.* The trial court's choice of this method was not an abuse of discretion. *Id.* Further, if Bonnie disagreed with this method of satisfying the property settlement,

she should have indicated this at the lower court level. "If a party does not present proposed findings of fact, or by some other motion, objection or exception indicate his disagreement with the trial court's findings, the sufficiency of the evidence to support the findings may not be questioned on appeal." *Mash v. Cutler* 488 N.W.2d 642, 648 (S.D. 1992) (citing *Jager v. Ramona Bd. of Educ.*, 444 N.W.2d 21, 26 (S.D.1989); *Burke v. Lead–Deadwood Sch. Dist. No. 40–1*, 347 N.W.2d 343, 344–45 (S.D.1984)).

> **ISSUE 4:** *Did the court err when it excluded the value of Bonnie's inheritance from the marital estate?*

By notice of review, Robert contends that the trial court erred in not valuing and including real and personal property that Bonnie inherited from her father, who died in December 1985. At the date of trial, the estate had not been closed.

In regard to inherited property, this court has stated: "It should be noted that with respect to inherited property it is not ipso facto excluded from consideration in the overall division of property, but rather it is in the trial court's discretion whether … inheritance should be excluded in making that determination." *Garnos v. Garnos*, 376 N.W.2d 571, 573 (S.D.1985) (citing *Balvin v. Balvin*, 301 N.W.2d 678, 680 (S.D.1981); *Buseman v. Buseman*, 299 N.W.2d 807, 809 (S.D.1980); *Laird v. Laird*, 322 N.W.2d 254, 256 (S.D.1982)). In this situation (and noting the factors to be considered in property divisions) Robert had little if any involvement with the property Bonnie inherited from her father and did nothing to contribute to the accumulation of the property. Exclusion of this inherited property was within the discretion of the trial court, and we will not set it aside. *Chicoine*, 479 N.W.2d at 895.

MILLER, C.J., and HENDERSON, SABERS and AMUNDSON, JJ., concur.